**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Peter Marceau; Jon Bodine; Rhonda McKinney; Brian Pine; Kathryn Smith, | ) ) | No. CV 05-02874-PHX-MHM |
| Plaintiffs, | ) ) | **ORDER** |
| vs. | ) ) ) | |
| International Brotherhood of Electrical Workers (IBEW) Local 1269; Dex Media, Inc.; Qwest Communications International, Inc.; Karen Ortega-Matson; Philip Wheeler, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

Currently before the Court is Defendants International Brotherhood of Electrical Workers Local 1269, Karen Ortega-Matson and Philip Wheeler's (collectively "Union Defendants") Motion to Dismiss (Dkt.#12) and Defendants Dex Media, Inc., and Qwest Communications International, Inc.'s (collectively "Corporate Defendants") Motion to Dismiss (Dkt#13). After reviewing the pleadings and hearing oral argument on June 5, 2006, the Court issues the following Order.

**I.    Background**

On September 19, 2005 Plaintiffs Peter Marceau, Jon Bodine, Rhonda McKinney, Brian Pine and Kathryn Smith ("Plaintiffs") filed their Complaint against the above-mentioned Defendants asserting claims arising out of the Racketeer Influenced and Corrupt

1    Organizations Act ("RICO"), 18 U.S.C.A. § 1962, et seq., and claims arising out of the Labor

2    Management Reporting and Disclosure Act of 1959 ("LMRA"), 29 U.S.C. § 186, et seq.

3    (Dkt.#1).    Plaintiffs and the individual Defendants Karen Ortega-Matson ("Defendant

4    Matson") and Philip Wheeler ("Defendant Wheeler") are alleged to be "premise sales

5    representatives" currently employed by Defendant Dex Media, Inc.("Defendant Dex");

6    previously employed by Qwest Communications International, Inc. ("Defendant Qwest"),

7    Defendant Dex's predecessor in interest. (Complaint ("Compl.") at ¶1).   A premise sales

8    representative sells yellow pages directory advertising to advertisers. (Compl. ¶1). Plaintiffs

9    allege that Defendants DEX, and previously Qwest, and Defendant International Brotherhood

10   of Electrical Workers Local 1269 ("Defendant IBEW" or "Union") along with fellow premise

11   sales representatives, Defendants Matson and Wheeler ("Union agents") have "acted in

12   concert to manipulate the calculation of sales performance and commissions and the account

13   assignment functions so that the Union agents would receive extraordinary compensation not

14   justified by their sales performance." (Compl. ¶1). Because sales personnel are evaluated and

15   compensated based upon their "Sales Performance Evaluation" ("SPE") compared with other

16   sales persons, any improper advantage to one salesperson injures the others.  (Compl. ¶1).

17   Plaintiffs allege that the motive behind paying the extraordinary compensation to the Union

18   agents is to exact concessions in a collective bargaining agreement from the Defendant Union

19   and "induce the union to perform its grievance representation in a purely perfunctory

20   manner." (Compl.¶2). Defendant Matson is alleged to be the Union executive board member

21   and Chairperson and Defendant Wheeler is alleged to be the former Union president.

22   (Compl.¶1).

23       Plaintiffs characterize the allegations describing the unlawful conduct as "THE

24   SCHEME." (Compl.p.8). Plaintiffs cite multiple specific examples of acts based upon the

25   racketeering activities of the Defendants such as the failure to record bad debts against the

26   Union agents; failure to adjust the Union agents score for losses regarding existing clients;

27   preference afforded to the Union agents with respect to certain attractive clients; permitting

28   "group advertisements" to the Union agents that are otherwise banned to the other premise

1   sales representatives; unfairly assigning accounts of former personnel to the Union agents;

2   permitting double commissions to the Union agents;  unfairly recording full workflow

3   requirements to the Union agents which allows them to receive new clients. (Compl. ¶ 22-

4   23).   Plaintiffs allege that the preferential treatment afforded to the Union agents

5   economically injures the other sales personnel, such as Plaintiffs.  Further, Plaintiffs allege

6   that Dex forgives the debt it is owed from the Union for the salary the Union is to pay its

7   Union agents while conducting "union business." (Comp.¶24).  In exchange for such

8   forgiveness, the Union does not monitor the activities of the Union agents and the Union

9   agents use their positions to influence management contracts with Dex and to "ensure that

10  the scheme... continues on an on-going basis." (Compl.¶26).  Plaintiffs seek injunctive relief

11  as well as damages.  (Compl.¶73).

12  **II.    Legal Standard**

13          "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely

14  granted."   Gilligan v. Jamco Development Corp., 108 F.3d 246, 249 (9th Cir. 1997).

15  Accordingly, the court will not dismiss a complaint unless it appears beyond a doubt that the

16  plaintiff can prove no set of facts to support the claim that would entitle the plaintiff to relief.

17  Morley v. Walker, 175 F.3d 756, 759 (9th Cir. 1999).   However, "the court [is not] required

18  to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

19  unreasonable inferences." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th

20  Cir.2001).

21          In determining whether a complaint states a claim, all allegations of material fact are

22  taken as true and construed in the light most favorable to the nonmoving party.  Wyler

23  Summit Partnership v. Turner Broad. Sys. Inc., 135 F.3d 658, 661 (9th Cir. 1998).  As such,

24  an inquiry into the adequacy of the evidence is improper when deciding whether to dismiss

25  for failure to state a claim.  Enesco Corp. v. Price/Costco, Inc., 146 F.3d 1083, 1085 (9th Cir.

26  1998).

27

28  **III.    Discussion**

The Corporate Defendants move to dismiss the claims alleged in Plaintiffs' Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P.  The Corporate Defendants contest Plaintiffs' allegations on two relevant bases: (1) Plaintiffs' RICO claims are time barred and (2) Plaintiffs' claims based upon § 1962 (b),(c) and (d) fail to state a claim.  Additionally, the Union Defendants move to dismiss Plaintiffs' claims on the basis that Plaintiffs' RICO and LMRA claims fail to state a claim.  The Corporate Defendants and Union Defendants adopt each other's separate Motions to Dismiss.

**A.    The Corporate Defendants' Statute of Limitations Argument Regarding Plaintiffs' RICO Claims.**

The Corporate Defendants argue that the statute of limitations bars the Plaintiffs' RICO claims in this case.  The applicable statute of limitations period to assert a RICO action is four years.  See Agency Holding Corp v. Malley-Duff & Associates, Inc., 483 U.S. 143, 107 S.Ct. 2759 (1987) (holding that appropriate statute of limitations to be applied in RICO civil enforcement action is four-year statute of limitations applicable to Clayton Act civil enforcement actions).  The Corporate Defendants rely on those portions of Plaintiffs' Complaint stating that the actionable conduct commenced in the year 2000.  For instance Plaintiffs allege with respect to Count One, "[f]rom 2000 to the present, the union received and receives income from a pattern of racketeering, and the union used and uses that income in the operation of the union." (Compl. ¶30).  In Count Two Plaintiffs cite 18 U.S.C. § 1962(b) and state that "[f]rom 2000 until the present, DEX (and previously Qwest) used a pattern of racketeering to acquire and maintain an interest in control over the union." (Compl. ¶40).  In Count Three Plaintiffs cite 18 U.S.C. § 1962(c) and state "from 2000 until present, DEX, Qwest, Ms. Ortega-Matson, and Mr. Wheeler conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the union through a pattern of racketeering activity..." (Compl. ¶49).  Based upon these allegations and others like them noting a date of the year 2000, the Corporate Defendants argue that Plaintiffs' claims are barred by the applicable four-year time period to assert a RICO claim.

1                (1)     "Injury Discovery Rule"

2      The Corporate Defendants argue that the "injury discovery rule" of the Ninth Circuit

3 is controlling in their favor, which provides that the RICO limitations period "begins to run

4 when a plaintiff knows or should know of the injury that underlies his cause of action."

5 Grimmett, 75 F.3d 506, 510 (9th Cir. 1996), cert dismissed, 519 U.S. 233 (1997) (citing

6 Pocahontas Supreme Coal Co., v. Bethlehem Steel Corp., 828 F.3d 211, 220 (4th Cir. 1987);

7 (citations omitted).[1]   Further, "[t]he plaintiff need not discover that the injury is part of a

8 "pattern of racketeering" for the period to begin to run." Id. (citing McCool v. Strata Oil Co.,

9 972 F.2d 1452, 1465 (7th Cir. 1992).

10      Thus, the "injury discovery rule" raises the issue of when the Plaintiffs discovered

11 their injuries arising out of the Defendants alleged unlawful conduct.  The Complaint is silent

12 as to the date the Plaintiffs discovered or should have discovered their alleged injuries arising

13 from the alleged scheme between the Defendants and there has been no discovery performed

14 on this issue.  Moreover, at oral argument Plaintiffs' counsel stated that the vast majority of

15 the predicate acts and all accompanying injuries alleged in the Complaint occurred within

16 the four-year limitations period.  Thus, clearly there is a factual dispute as to the date of the

17 alleged injuries.  This factual issue as to when the Plaintiffs discovered their injuries is a

18 question of fact and it would be premature for this Court to make a determination that the

19 Plaintiffs contemporaneously discovered their injuries when the alleged scheme commenced.

20 See Tanaka v. 104 F. Supp.2d at 1248 (D. Hawaii 2000) (holding that plaintiff's knowledge

21 of injury in RICO case is a material question of fact); (citing Tucker v. Baxter Healthcare

22 Corp., 158 F.3d 1046, 1050 (9th Cir. 1998) (finding in non-RICO case that where fact issue

23 exists as to when statute of limitations begins to run, summary judgment is improper).

24

25      [1]The Ninth Circuit is one of several Circuits that follow the "injury discovery rule."

26 While the Supreme Court has limited the application of other such rules followed in other

27 Circuits in Klehr v. A.O. Smith Corp., 521 U.S. 179, 190, 117 S.Ct. 1984 (1997) and Rotella v. Wood, 528 U.S. 549, 120 S.Ct. 1075 (2000), this rule is good law in the Ninth Circuit.  See

28 Tanaka v. First Hawaiian Bank, 104 F. Supp.2d 1243, 1246 (D. Hawaii, 2000).

1   The Corporate Defendants argue that because Plaintiffs fail to plead any specific date,

2   that any argument in support of tolling the applicable limitations period is waived.  See

3   Rutledge v. Boston Woven Hose & Rubber Co, 576 F.2d 248, 249 (9th Cir. 1978) (stating that

4   to avoid the bar of limitation by invoking concept of fraudulent concealment, plaintiff must

5   allege facts showing affirmative conduct upon the part of the defendant which would lead

6   a reasonable person to believe that he did not have a claim for relief).  However, as discussed

7   below, while the Corporate Defendants are correct that the failure to plead equitable tolling

8   waives any such defense, equitable tolling and the time Plaintiffs discovered their injuries

9   are separate and distinct issues.  See Tanaka, 104 F. Supp.2d at 1243-48 (discussing

10  determination of injury discovery date and application of equitable tolling).  For example,

11  if it were determined that Plaintiffs could not or did not discover their injuries until sometime

12  after the limitations period, then Plaintiffs would not need to raise an equitable tolling

13  argument.

14                  (a)     Application of "Injury Discovery Rule" to Plaintiffs Smith and Marceau.

15  The Corporate Defendants attach to their Motion to Dismiss exhibits demonstrating

16  that Plaintiffs Smith and Marceau have filed charges with the National Relations Labor

17  Board ("NLRB") regarding matters similar to the allegations in Plaintiffs' Complaint.

18  (Corporate Defendants' Motion to Dismiss, Exhibit C and D).[2]  It appears the Corporate

19  Defendants  rely on these previous charges to demonstrate that both Smith and Marceau have

20  been aware of their injuries prior to filing the present lawsuit.  First, Smith filed a charge with

21  the NLRB in 1992 (Corporate Defendants' Motion to Dismiss, Exhibit C) against her former

22  employer U.S. West Direct alleging that her termination from U.S. West Direct was the result

23  of the Union's efforts to advance the monetary compensation and careers of union

24  representatives employed in the sales position and was for self-serving reasons.  However,

25

26

27        [2]See Mack v. S.Bay Beer Distribs., Inc., 798 F.2s 1279, 1282 (9th Cir. 1986) (stating that courts can take judicial notice of records and reports of administrative body), *overruled*

28  *on other grounds by* Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104 (1991).

the similarity between Smith's NLRB charge and the current charges, while, possessing a general similarity in terms of the allegations, does not demonstrate that Smith was aware of the current injuries alleged in the Complaint prior to or contemporaneously with the conduct alleged in 2000.  Rather, there are questions of fact as to when she became aware of the injuries alleged in the Complaint.   For example, the NLRB charge involves U.S. West, a wholly distinct party who is not involved in this litigation.

The same factual questions exist with respect to Plaintiff Marceau, who in 2003 filed a charge with the NLRB against Dex and Qwest alleging that between 1999 and 2003 similar preferential treatment was being afforded to union agents.  However, even assuming that Plaintiff Marceau's charges are identical to the allegations set forth in the Complaint, it still begs the question of when he discovered his injury.  For instance, if he discovered the injury from such preferential treatment sometime after September 19, 2001 and before he filed his NLRB charge in 2003, his actions would be timely before this Court.

Thus, the determination of when Plaintiffs discovered or should have discovered their injuries remains a question of fact.

(2)    "Separate Accrual Rule"

The Corporate Defendants also argue that the "separate accrual rule" does not save Plaintiffs' RICO claims based upon continuing conduct and injuries into the limitations period.  The "separate accrual rule" provides that a new cause of action accrues for each new and independent injury even though the RICO violation causing the injury happened more than four year earlier.[3]  Grimmett, 75 F.3d at 510, (citing Bankers Trust Co. v. Rhoades, 859 F.3d 1096, 1102 (2d Cir. 1988), cert denied, 490 U.S. 1007, 109 S.Ct. 1642 (1989)).[4]  The

_____

[3]A corollary rule to "separate accrual rule" is that damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period.  Grimmett, 75 F.3d at 512.

[4]As noted above, and conceded by the Corporate Defendants' counsel at oral argument, if it can be determined that the predicate acts and more importantly the injuries resulting from the predicate acts occurred within the limitations period then the "separate

1   Ninth Circuit provides instruction in applying the "separate accrual rule" in holding that:

2   "two elements characterize an overt act which will restart the statute of limitations: (1) it

3   must be a *new and independent act* that is not merely a reaffirmation of a previous act; and

4   (2) it must inflict *new and accumulating injury* on the plaintiff." Grimmett, 75 F.3d at 513

5   (citing Pace Industries, Inc., v. Three Phoenix Co., 813 F.2d 234 (9th Cir. 1987) (emphasis

6   original)).

(a)      "New and Independent" Acts

8           Plaintiffs' Complaint relates multiple specific instances of preferential treatment

9   afforded to the Union agents by the Corporate Defendants as part of a scheme implemented

10  by the Defendants.  These acts are not sorted out by date, but to the extent certain acts and

11  injuries occurred prior to the limitations period, the "separate accrual rule" is implicated.

12  Thus, the issue is whether the acts are "new and independent" or are rather based upon

13  "reaffirmations of previous acts." Grimmett, 75 F.3d at 513.  In Grimmett, the Ninth Circuit

14  found that the plaintiffs failed to satisfy this test based upon the four post-limitations acts

15  alleged in their complaint.  Specifically, the Ninth Circuit noted that the post-limitation acts

16  were all "part of the same corporate re-organization/bankruptcy scheme." Id. at 514.  The

17  same is true here.  Plaintiffs refer to the alleged actionable conduct by Defendants as part of

18  a "scheme" which continued on an "on-going basis." (Compl.¶ 26).  Further, the predicate

19  acts that are part of this scheme appear to be interrelated to provide preferential treatment to

20  the Union agents and exact concessions in Union relations.  While each individual act may

21  be somewhat different in nature, the act itself is the same in that it is part of the overall

22  furtherance of the purported scheme between the Defendants to obtain unjust compensation

23  and related benefits.  As such, the Plaintiffs' allegations based upon "reaffirmations" of

24  previous acts in furtherance of the scheme does not support the application of the "separate

25  accrual rule."

(b)      "New and Accumulating" Injury

28  accrual rule" is irrelevant.

- 8 -

1    Further, even if the predicate acts above were "new and independent" the "separate

2    accrual rule" would still not apply because the injuries alleged by Plaintiffs resulting from

3    the scheme are not "new and accumulating."  Rather, the injuries alleged by Plaintiffs are

4    merely an accumulation of the same injury.  The holding in Grimmett, is instructive in

5    demonstrating the application of "new and accumulating" injuries of the "separate accrual

6    rule."  Specifically, the Ninth Circuit noted that the injury must be "new and independent"

7    of the previous untimely injuries.  Id. at 513.  In Grimmett, the Ninth Circuit found that the

8    four post limitation acts that would potentially fall within the limitations period were not

9    sufficient to justify invocation of the "separate accrual rule" because the injuries claimed by

10   the plaintiff were identical to those alleged prior to the limitations period, which all related

11   to the loss of the plaintiffs interest in the business.  Id. at 514.

12   Here, the Plaintiffs' injuries are that they were wrongfully deprived compensation as

13   a result of a scheme by Defendants which grants preferential treatment to the Union agents

14   as well as lost concessions in labor relations due to Corporate Defendants influence over the

15   Union.  (Compl.¶20-26).  The Complaint relates that the scheme began in 2000 and

16   continued through the limitations period resulting in a "pattern of racketeering" and was the

17   Defendants' "regular way of conducting business."  (Compl. ¶36).  A plain reading of the

18   Complaint demonstrates that the alleged injuries sustained by Plaintiffs are identical

19   throughout the relevant period.  Plaintiffs even acknowledge in their Response to the

20   Corporate Defendants' Motion to dismiss, that their injuries are based upon an accumulation

21   of loss of financial compensation. (Plaintiffs' Response, p. 8: "Plaintiffs allege new and

22   independent acts during the limitations period, each of which inflicted new and accumulating

23   injury to Plaintiffs' financial compensation."; p. 11: "[e]ach predicate act had a separable and

24   identifiable effect upon the accumulation of damages.").   There is nothing new about

25   Plaintiffs' injuries over the time period specified in the Complaint.

26   The Eleventh Circuit in Bivens Garden Office Bldg., Inc., v. Barnett Bank of Florida,

27   Inc., 906 F.2d 1546 (11th Cir. 1990), abrogated on other grounds by Rotella v. Wood, 528

28   U.S. 549 (2000), which also uses "new and independent" language in its "separate accrual"

1   rule is also instructive.  The Eleventh Circuit held that the latter two of the three total alleged

2   predicate acts of: (1) a wrongful takeover of a limited partnership in 1975; (2) the

3   mismanagement and diversion of the partnership's assets from 1975 to 1981; and (3) the sale

4   of the partnership's primary asset, a hotel, at below fair market value in 1981, were "new and

5   independent" acts because they "[were] not included among the injuries that naturally flow

6   from the wrongful takeover [in 1975]." Id. at 1551.  Here, the injuries alleged naturally flow

7   from each other.  They are directly related to the scheme implemented by Defendants causing

8   financial harm to Plaintiffs based upon the loss of commissions and concessions.  Thus, each

9   subsequent act generates the same result, the loss of revenue to Plaintiffs based upon the

10  preferential treatment given to the Union representatives.

11         Lastly, the Eleventh Circuit's holding in Pilkington v. United Airlines, 112 F.3d 1532

12  (11th Cir. 1997) is also instructive.  In Pilkington, the pilot plaintiffs brought RICO claims

13  against the airline and the union alleging that they were wrongfully harassed for acting as

14  replacement workers while on strike.  The predicate acts began well before the limitations

15  period.  However, to avoid the statute of limitations, the plaintiffs argued that each act of

16  harassment amounted to a new injury and therefore a new cause of action.  The Eleventh

17  Circuit rejected this argument holding that while each new act of harassment may have

18  accumulated the injury, the injury was not new and independent.  Id. at 1537-38.    The

19  alleged injuries within the limitations period were not "unfamiliar, strange, or different." Id.

20  Here, there is nothing "unfamiliar, strange or different" regarding the injuries to the

21  Plaintiffs alleged in the Complaint.  Specifically, the Plaintiffs are alleged to have sustained

22  the continuing injury of damage to their financial status based upon the scheme of the

23  Defendants.

24         As such, based upon the allegations set forth in Plaintiffs' Complaint, and to the extent

25  the "separate accrual rule" is relevant, it is not applicable to Plaintiffs' RICO claims.  While

26  it is premature to determine when the Plaintiffs discovered their injuries, it is clear that if the

27  discovery of their injuries resulting from certain predicate acts occurred prior to September

28  19, 2001, the subsequent acts are not saved by the "separate accrual rule."

1              (3)     Application of Equitable Tolling

2        Lastly, as mentioned above, the doctrine of equitable tolling is not applicable. This

3  doctrine, also known as fraudulent concealment, applies where a plaintiff shows that he or

4  she neither knew nor, in the exercise of due diligence could reasonable have known of the

5  offense.  Klehr v. A.O. Smith Corp., 521 U.S. 179, 195, 117 S.Ct. 1984 (1997).  However,

6  Plaintiffs make no reference of the application of such tolling in their Complaint nor in their

7  papers.   In such circumstances, the Court finds that Plaintiff waives any such tolling

8  argument.  Grimmett, 75 F.3d at 514 (holding that where plaintiff never pled concealed facts

9  in favor of tolling in complaint, plaintiff waived tolling defense).

10     **B.     Corporate Defendants' Alternative Basis for Dismissal of Plaintiffs' RICO
           Claims Pursuant to 18 U.S.C. § 1962(b),(c) and (d)**

11

12       The Corporate Defendants also requests dismissal of the RICO claims asserted by

13  Plaintiffs on alternative grounds.  Specifically, the Corporate Defendants argue that Plaintiffs

    fail to allege a claim pursuant to 18 U.S.C. § 1962(b),(c) and (d).
14

15              (1)     Section 1962(b) Analysis

16       18 U.S.C. § 1962(b) provides in pertinent part:

17           It shall be unlawful for any person through a pattern of racketeering activity
         or through collection of an unlawful debt to acquire or maintain, directly or
18         indirectly, any interest in or control of any enterprise which is engaged in, or
         the activities of which affect, interstate or foreign commerce.

19              (a)     "Interest in or Control of"

20       The Corporate Defendants first basis for dismissal of this claim is that Plaintiffs'

21  Complaint does not allege that the Corporate Defendants  had an "interest in or control" of

22  the enterprise, the Union.   However, a review of the Complaint sets forth multiple instances

23  demonstrating the alleged control implemented over the Union.  For instance, the Plaintiffs

24  allege that the Corporate Defendants provided preferential treatment to the Union agents so

25  as "to have an interest in or control over the union's collective bargaining and grievance-

26  processing decisions." (Compl.¶¶42, 43).  Plaintiffs also allege that the Corporate Defendants

27  provided preferential treatment to the Union agents to influence "their implied power to

28  create or eliminate labor strife."  (Compl.¶26).  Lastly, Plaintiffs allege that the Corporate

1   Defendants forgave the Union debt that was owed to them based upon the payments made
2   by Dex to Defendant Ortega-Matson for time spent conducting Union business. (Compl.¶24).
3   It is based upon these allegations that Plaintiffs claim that the Corporate Defendants
4   possessed an "interest in or control of" the Union.

5        As noted by the Ninth Circuit, there is little case law addressing the term "control."
6   Ikuno v. Yip, 912 F.2d 306, 310 (9th Cir. 1990). Thus, the Ninth Circuit turned to the Second
7   and Seventh Circuit for assistance. In Sutliff, Inc. v. Donovan Co., 727 F.2d 648, 653 (7th
8   Cir.1984), the court opined that control within the meaning of § 1962(b) need not be formal
9   control and "need not be the kind of control that is obtained, for example, by acquiring a
10  majority of the stock of a corporation." (citing United States v. Jacobson, 691 F.2d 110, 112
11  (2d Cir.1982) (per curiam)); see also Cincinatti Gas & Elec. Co. v. General Electric Co., 656
12  F. SUPP. 49, 85 (S.D.Ohio 1986) (party found to have control under § 1962(b) when it had
13  voting rights and was directly involved in management). In relying on this holding, the Ninth
14  Circuit found that "control under § 1962(b) is best determined by the circumstances of each
15  case and does not require formal control such as the holding of majority stock or actual
16  designation as an officer or director." Ikuno, 912 F.2d at 310. Thus, in Ikuno, the Ninth
17  Circuit found sufficient evidence to survive summary judgment on the issue of control based
18  upon evidence demonstrating that the defendant attorney was the incorporator of the entity,
19  negotiated a lease for it, signed its corporate reports in a space designated for officers and
20  directors of the corporation and held himself out as the company's attorney. Id. at 310.

21       The Corporate Defendants contend that even though the "interest in or control of"
22  standard may be based upon formal or informal control by the defendant over the enterprise,
23  the plaintiff is still required to demonstrate some degree of "actual command" over the
24  enterprise. The Corporate Defendants argue that Ikuno supports this conclusion as the
25  defendant attorney "acted for a 'phantom corporation' by incorporating it, negotiating its
26  leases, filing and signing its annual reports, and acting as an attorney" Id. at 308. Further,
27  in Sutliff the defendants "took advantage of [incapacitated] mental state of formal head of
28  company to require de facto command." However, these cases do not provide as strong a

1    showing of "actual command" as the Corporate Defendants would like. Rather, these cases,

2    like the instant case, demonstrate that some degree of control by the defendant must exist

3    over the enterprise based upon the circumstances of each case. This degree of control is

4    alleged in this case.

5        Thus, Plaintiffs' allegations adequately allege the requisite degree of "interest in or

6    control of" pursuant to § 1962(b).

7                    (b)    Distinct Injury

8        The Corporate Defendants further argue that Plaintiffs' claim under § 1962(b) fails

9    because Plaintiffs' fail to allege the existence of a distinct injury. The Corporate Defendants

10   rely on the Ninth Circuit's holding in Wagh v. Metris Direct, Inc., 363 F.3d 821, 830 (9th Cir.

11   2003), which stated that to state a RICO claim under § 1962(b), a plaintiff must allege "an

12   injury to plaintiff resulting from defendant's control of a RICO enterprise." (citing Sebastian

13   Int'l, Inc., v. Russolillo, 186 F. Supp.2d 1055, 1068 (C.D.Cal. 2000)). The Corporate

14   Defendants argue that dismissal of Plaintiffs' claim on this basis is appropriate for three

15   reasons: (1) Plaintiffs' Complaint alleges the injuries caused by the predicate act and the

16   injuries caused by Qwest and Dex alleged control of the Union are identical; (2) Plaintiffs'

17   allegations are "general, conclusory and vague;" and (3) Plaintiffs' fail to satisfy RICO's

18   general injury requirement.

19       First, the Corporate Defendants argue that Plaintiffs' damages are not distinct because

20   the predicate act and resulting injury of preferential treatment are one in the same. The

21   Corporate Defendants cite that Plaintiffs' Complaint asserts that the predicate act allegedly

22   used to gain control of the Union was "preferential treatment" by Dex of the Union agents

23   in violation of 29 U.S.C. § 186(a) and (b) (Compl. ¶41). However, a reading of the entirety

24   of ¶43 relates that "Plaintiffs were and are injured by Dex's (and previously Qwest's) interest

25   in or control over the Union because that interest in or control leads to concessions by the

26   Union in collective bargaining that are unfavorable to Plaintiffs, perfunctory processing of

27   Plaintiffs' grievances by the Union, and a continuation of the preferential treatment given the

28   Union agents, which directly reduces Plaintiffs' compensation." (Id.). Thus, other than

1    damages based upon preferential treatment, Plaintiffs allege damages based upon loss of

2    control in collective bargaining agreements, processing of grievances and a reduction of

3    compensation.

4           Second, the Corporate Defendants' argument that the injuries other than "preferential

5    treatment" mentioned above, are "general, conclusory and vague" is also unavailing. In In

6    re Teledyne Defense Contracting Litigation, 849 F. Supp. 1369, 1373 (C.D. Cal. 1993), the

7    district court dismissed the plaintiff's § 1962(a) and (b) claims because plaintiffs failed to

8    explain how damages were caused "by reason of" either use of investment or of racketeering

9    income or acquisition or control of interest in the RICO enterprise.  The plaintiffs' complaint

10   in In Re Teledyne related only that the plaintiffs sustained damages in the form of

11   expenditures of money as a result of the corporation's retention of defense contracts and other

12   fraudulent and illegal actions.  Id.  Thus, because there was no averment or explanation of

13   how to damages were cause "by reason of" the defendants' use or investment of racketeering

14   income or defendants' acquisition or control of an interest in the RICO enterprise, the

15   plaintiffs' § 1962(b) claim failed.  Id. (citing Imagineering Inc., v. Keiwit Pacific Co., 976

16   F.3d 1303, 1311 (9th Cir. 1992)(stating that RICO claim must be "but for" as well as

17   "proximate cause" of injuries complained of).  In other words, "to maintain a cause of action

18   under RICO then, the plaintiff must show not only that the defendant's violation was a "but

19   for" cause of his injury, but that it was the proximate cause as well.  This requires that there

20   must be a direct relationship between the injury asserted and the injurious conduct alleged.

21   Imagineering, 976 F.2d at 1311.  Plaintiffs' Complaint sufficiently sets forth such causation.

22   Specifically, as noted above, Plaintiffs allege that the Defendants have engaged in

23   racketeering activities and use their influence to maintain in interest in or control over the

24   Union in the form of preferential treatment to the Union agents, thus resulting in the

25   Corporate Defendants exercise of a degree of control over the Union, control over the

26   collective bargaining process, control over grievance procedures and continued preferential

27

28

1  treatment to the Union agents which adversely bears on the Plaintiffs' compensation. These

2  allegation sufficiently allege a relationship between the injury and the conduct.[5]

3      Lastly, the Corporate Defendants note that the Ninth Circuit in <u>Oscar v. University</u>

4  <u>Students Co-op. Ass'n</u>, 965 F.2d 783, 785 (9th Cir. 1992) held that a showing of "injury"

5  requires proof of "concrete financial loss" and not mere injury to an intangible property

6  interest.  (citing <u>Berg v. First State Ins. Co.</u>, 915 F.2d 460, 464 (9th Cir. 1990).  Thus, the

7  lesson in <u>Berg</u>, as noted in <u>Oscar</u>, is that "injuries to property are not actionable under RICO

8  unless they result in tangible financial loss to the plaintiff." <u>Id.</u>  The court in <u>Oscar</u> affirmed

9  the district court's dismissal upon a 12(b)(6) motion because of the plaintiff's failure to allege

10  any financial loss which would be compensable under RICO.  Specifically, the plaintiff did

11  not allege any out-of-pocket expenditures, but rather relied only on a "decrease in the value

12  of her property." <u>Id.</u>  In the instant case, Plaintiffs have sufficiently alleged a "concrete

13  financial loss."  For instance, Plaintiffs, as premise sales representatives, allege that as a

14  result of Defendants' racketeering activities they are adversely affected personally and

15  financially.  Moreover, Plaintiffs allege because of the preferential treatment given to the

16  Union agents, that the Plaintiffs have sustained reduced compensation. (Compl.¶43). Such

17  allegations adequately state the existence of a "concrete financial loss."  For example, in

18  <u>Steele v. Hospital Corp. of America</u>, 36 F.3d 69, 70 (9th Cir. 1994)  the Ninth Circuit

19  explained that the plaintiffs RICO claim was subject to dismissal based upon lack of standing

20  due to plaintiffs' claim for damages arising out fraudulent health care billings that the

21  plaintiffs' insurers paid.  The Ninth Circuit noted that because the plaintiff patients had paid

22  none of the fraudulent charges out of their own pockets, but were covered by insurance, they

23  suffered no financial loss.  Unlike <u>Steele</u>, in the instant case, Plaintiffs are making a claim

24

25

26      [5]It is important to bear in mind that at the 12(b)(6) stage of litigation in a RICO case, "general factual allegations of injury resulting from the defendant's conduct may suffice...

27  [as] general allegations embrace those specific facts that are necessary to support the claim." <u>National Organization for Women, Inc., v. Scheidler</u>, 510 U.S. 249, 256, 114 S.Ct. 798

28  (1994) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561, 112 S.Ct. 2130 (1992).

1   for "concrete financial loss" in the form of lost compensation to them personally due to the

2   alleged racketeering activities of the Defendants.

3        Thus, in reviewing the allegation set forth in Plaintiffs' § 1962(b) claim, the Court

4   finds that Plaintiffs adequately state a claim.

5                    (2)    Section 1962(c) Analysis

6                         (a)    Count III

7        In Count III of Plaintiffs' Complaint they assert a claim based upon § 1962(c), which

8   prohibits a person "employed or associated with any enterprise" from using a pattern of

9   racketeering activity to "conduct or participate, directly or indirectly, in the conduct of such

10  enterprise's affairs." Specifically, the Corporate Defendants argue that Plaintiffs fail to allege

11  that the Corporate Defendants directed the Union's affairs as the allegations asserted are

12  "vague and conclusory."

13       As Defendants point out, in Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S.Ct.

14  1163 (1993) the Supreme Court stated that "to conduct or participate, directly or indirectly,

15  in the conduct of such enterprise's affairs," one must conduct or participate in the operation

16  or management of the enterprise itself.  In reviewing the Plaintiffs' Complaint it is apparent

17  to the Court that Plaintiffs have set forth sufficient allegations regarding such participation

18  by the Corporate Defendants in exercising some degree of control over the Union.  For

19  instance, Plaintiffs allege that the Corporate Defendants have acquired and maintain an

20  interest in or control over the Union based upon consideration in the form of "preferential

21  treatment" to the Union agents, who in turn grant the Corporate Defendants an interest in or

22  control over the management of the Union, such as management of contracts and the power

23  to create or eliminate labor strife.  (Compl. 49, 24-26).  These allegations adequately inform

24  the Defendants of the alleged control or participation in the Union by the Corporate

25  Defendants.

26                         (b)    Count IV

27       The Corporate Defendants move to dismiss Count IV which is also based upon §

28  1962(c).  Specifically, the Corporate Defendants argue that dismissal of Count IV is

- 16 -

appropriate because of the failure to plead the existence of an "association-in-fact enterprise." Pursuant to 18 U.S.C. § 1961(4) an enterprise is defined as a "union or group of individuals associated in fact although not a legal entity."  Both parties cite the Ninth Circuit's discussion of the existence of an "enterprise" in RICO actions in <u>Chang v. Chen</u>, 80 F.3d 1293, 1299-1300 (9th Cir. 1996).  In <u>Chang</u>, the Ninth Circuit held that "[a]t a minimum, to be an enterprise, an entity must exhibit "some sort of structure ... for making of decisions, whether it be hierarchal or consensual." (citing <u>United States v. Riccobene</u>, 709 F.2d 214, 223-24 (3d Cir 1983)) <u>cert denied</u>, 464 U.S. 849 (1983)).  Additionally, the Ninth Circuit instructed that the "structure should provide some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad-hoc, basis."  <u>Id.</u> However, "[t]he structure requirement 'does not mean that every decision must be made by the same person, or that authority may not be delegated.'" <u>Id.</u>

The Corporate Defendants contend that dismissal of this claim is proper due to the Plaintiffs' failure to make any allegations explaining the hierarchal relationship or decision-making structure of the alleged association in fact.  However, again, the Court finds this argument unavailing.  The Plaintiffs' Complaint provides sufficient allegations demonstrating the existence of an "association in fact" structure.  For instance, it is important to note that the Complaint alleges the existence of involvement by the Corporate Defendants themselves, *i.e.*, Defendant Dex and Qwest.  This involvement provides a sufficient basis for establishing the requirement of a separate structure.  In <u>Chang</u>, the Ninth Circuit noted that in such instances it has found a separate structure based upon associating in fact to commit unlawful activity.  <u>Id.</u> at 1300 (citing <u>United States v. Feldman</u>, 853 F.2d 648, 660 (9th Cir. 1988)).  The detrimental aspect of the plaintiff's allegations of such a structure in <u>Chang</u> was that the corporation involved was not alleged to play any role in the alleged enterprise.  <u>Id.</u> at 1301.  Here, however, the Plaintiffs have expressly named the Corporate Defendants as defendants in this case and have identified the alleged role they played in the alleged scheme in providing preferential treatment to the Union agents and forgiving the Union debt.  In such

1    circumstances, there is sufficient basis to find the existence of an association-in-fact

2    enterprise.

3            (3)    Section 1962(d) Analysis

4            The Corporate Defendants contend that because Plaintiffs have failed to state a claim

5    under the other applicable sections of § 1962 that Plaintiffs' § 1962(d) claim must also be

6    dismissed.  However, such argument is without merit as the Court has determined that the

7    other RICO claims are sufficiently alleged so to proceed forward.

8        **C.    Summary of Corporate Defendants' Motion to Dismiss**

9            Plaintiffs' RICO claims are not barred by the applicable statute of limitations as

10   contested in the Corporate Defendants' Motion to Dismiss.  Rather, there are factual issues

11   outstanding with respect to when Plaintiffs first became aware of their injuries.  If Plaintiffs

12   became of their injuries subsequent to September 19, 2001, Plaintiffs' claims are timely.

13   However, the Court finds that application of the "separate accrual rule" is not applicable as

14   Plaintiffs' Complaint does not relate predicate acts that are "new and independent" that

15   produce "new and accumulating" injuries.  Additionally, Plaintiffs waive any argument that

16   the doctrine of equitable tolling saves their RICO claims.  Lastly, the Court finds that

17   Plaintiffs adequately state their RICO claims under Rule 12(b)(6) analysis and the claims are

18   not subject to dismissal on this basis.

19       **D.    Union Defendants' Challenges to Plaintiffs' RICO and LMRA Claims.**

20           In addition to joining the Corporate Defendants' Motion to Dismiss, the Union

21   Defendants also challenge Plaintiffs' RICO claims as well as Plaintiffs' LMRA claims.

22   Specifically, the underlying predicate acts of the RICO claims are the violations of the

23   LMRA asserted by Plaintiffs.  As such, the Union Defendants claim that because the LMRA

24   claims fail to state a claim and the RICO predicate acts are based upon Plaintiffs' LMRA

25   claims, both the LMRA and RICO claims must be dismissed.

26           (1)    Applicability of 29 U.S.C. § 186(c)(1).

27           Plaintiffs assert claims pursuant to the LMRA (commonly referred to as § 302);

28   specifically relying on § 186(a) and (b).  § 186(a) provides in pertinent part:

It shall be unlawful for an employer or association or employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or thing of value -

> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
>
> (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affective commerce; or
>
> (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

Additionally, § 186(b)(1) provides in pertinent part:

It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value by subsection (a) of this section.

Plaintiffs allege that the Defendants violated these provisions by manipulating the SPE score applicable to the Union agents, resulting in extraordinary income and such preferential treatment constitutes "things of value." (Compl.¶67-73). Additionally, Plaintiffs allege that the Defendants violated these provisions by forgiving the debt owed by the Union. (Id). Lastly, Plaintiffs allege the Defendants violated the above provisions by accepting the debt forgiveness. (Id).

The Union Defendants argue; however, that these allegations do not state a claim under the LMRA because the alleged conduct falls within an applicable exception of § 186; specifically (c)(1). This provision relates in pertinent part:

The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer...

The Union Defendants rely on the language of § 186(c)(1) for the proposition that any and all conduct is excluded as actionable where the employer provides a labor organization

and its representatives with "things of value" for the purpose of influencing the collective bargaining relationship. (Union Defendants Motion to Dismiss, p.7). Specifically, the Union Defendants argue that the two categories of violations that Plaintiffs assert under the LMRA; (1) alleged favoritism to the Union agents and (2) forgiveness of the Union's alleged indebtedness by Dex are not actionable.

              (a)      Alleged Favoritism to Union Agents Does Not Fall Within Scope of § 186(c)(1).

The Union Defendants contend that the preferential treatment that the Corporate Defendants allegedly provide falls within the scope of § 186(c)(1) "by reason of their services in selling the products of the employer" because "[b]ut for the fact that they perform sale services for their employer... they would not receive preferential treatment of any kind." (Union Defendants' Motion to Dismiss, p.8).  Conversely, Plaintiffs argue that such preferential from Dex to the Union agents is not exempt under § 186(c)(1) because it is "above and beyond the treatment to which sales representatives are entitled under the labor contract and written Company policy" and thus the preferential treatment is not "compensation for, or by reason of, [their] service as an employee of [Dex]" but is a bribe to influence the Union agents actions. (Plaintiffs' Response to Union's Motion to Dismiss, p.9).

The Ninth Circuit's decision in <u>Machinists Lodge 964 v. BF Goodrich Aerospace</u>, 387 F.3d 1046 (9th Cir. 2004) is instructive.  In <u>Machinists</u>, the court was presented with the legality of a collective bargaining agreement that called for the payment from the employer to pay the salary and benefits of a "Chief Shop Steward" who processed grievances.  <u>Id.</u> at 1048.  The Ninth Circuit held that the collective bargaining provision which called for the employer to pay the salary and benefits owed to the steward did not violate the LMRA, and relied upon § 186(c)(1).  The Ninth Circuit accepted the "core" of the union's argument which was that the steward should be excepted because he served the interests of the employer by playing an integral role in enforcing the terms of the collective bargaining agreement and resolving disputes.  <u>Id.</u> at 1057.  In other words, the steward's compensation

was attributable to his "service" to the employer. Id. (emphasis added). The Ninth Circuit also made sure to note that § 302(c)(1) is not applicable to instances in which the person simply remains on the company's payroll. Specifically, "Section 302(c)(1) legalizes payments to current or former employees based on their 'services' as employees, not their 'status' as such." Id. Thus, the holding in Machinists makes clear that the payment to an employee union representative from the employer is not to be made irrespective of the actual services he or she provides the employer. Rather, such payments, that fall within the scope of § 186(c)(1) have a direct correlation to the services rendered. See also United States v. Phillips, 19 F.3d 1565, 1575 (11th Cir. 1994) (stating that "[w]hether as 'compensation for' or 'by reason of' service to any employer, all payments from an employer to a union official must relate to services actually rendered by the employee for the section 186(c)(1) exception to apply.").

Here, the allegations made by Plaintiffs relate to unjust payments made to the Union agents that fall outside the scope of "services" that the Union agents perform as employees of Dex. Rather, Plaintiffs allege that the Union agents have accepted bribes from Dex in exchange for providing undue employer influence in labor relations. Such allegations exceed the scope of "services" to which the Union agents are entitled from the Corporate Defendants in the course of their employment as sales representatives and do not relate to services actually rendered. Because these allegations are not exempted by § 186(c)(1) they adequately state a claim in support of a LMRA violation and, in turn, a RICO predicate act.

(b)     § 186(c)(1) Does Not Apply To Plaintiffs' Debt Forgiveness Allegations

In addition, the Union Defendants argue that Plaintiffs' LMRA claims based upon the unlawful arrangement between the Corporate Defendants and the Union regarding the forgiveness of Union debts by Dex is excepted by § 186(c)(1). However, by its terms § 186(c)(1) exempts only money or things of value payable to employees from the employer for established services such as labor relations. Here, Plaintiffs' allegations of debt forgiveness to the Union fall outside the scope of § 186(c)(1) as that provision applies only

to employees and former employees.  Moreover, even if such allegations touched on § 186(c)(1), as noted above, it would not apply to the allegations at issue.  Contrary to the Union Defendants' position, Plaintiffs are not contesting standard payments to the Union agents from the Corporate Defendants, but are contesting unjust payments based upon preferential treatment that are not based upon the Union agents service or normal scope of duties with the Corporate Defendants.   Such allegations fall outside the scope of "no docking" provisions, upon which the Union Defendants rely which in certain situations authorize payments to Union agents by the employer. See Machinists, 387 F.3d at 1052-60 (finding that provision of collective bargaining agreement requiring employer to pay salary of chief shop steward for his work as employee representative did not violate the LMRA and fell within exception of § 186(c)(1) where his work served the company's interests).   Here, Plaintiffs are challenging an apparent scheme between the Defendants that provides for payments to the Union agents irrespective of their service with the Corporate Defendants, as such § 186(c)(1) is not applicable and Plaintiffs adequately state a claim and a RICO predicate act.

**Accordingly,**

**IT IS HEREBY ORDERED** denying the Corporate Defendants' Motion to Dismiss. (Dkt.#12).  The Court cannot determine at this time if Plaintiffs' claims are untimely as the date Plaintiffs' discovered their injuries is a question of fact.  Otherwise, Plaintiffs' RICO claims adequately state a claim.

**IT IS FURTHER ORDERED** denying the Union Defendants' Motion to Dismiss. (Dkt.#13).

DATED this 7th day of July, 2006.

_____
Mary H. Murgula
United States District Judge