**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Peter Marceau, Jon Bodine, Rhonda McKinney, Brian Pine, Kathryn Smith,　　　) | Case No. CV 05-2874-PHX-MHM |
| 　　　　　　　Plaintiffs,　　　　　　) | **ORDER** |
| vs.　　　　　　　　　　　　　　　) | |
| International Brotherhood of Electrical Workers, Local 1269, Dex Media, Inc., Qwest Communications International, Inc., Karen Ortega-Matson, and Philip Wheeler,　　　　　　　　　　) | |
| 　　　　　　　Defendants.　　　　　) | |

Currently pending before the Court are Defendants Dex Media, Inc. and Qwest Communications International, Inc.'s ("Corporate Defendants") Motion for Summary Judgment (Dkt. #256), and Defendants International Brotherhood of Electrical Workers Local 1269's ("Union") and Karen Ortega-Matson and Philip Wheeler's ("Union Agents") Motion for Summary Judgment (Dkt. #257). Also pending before the Court is Plaintiffs Peter Marceau, Jon Bodine, Rhonda McKinney, Brian Pine, and Kathryn Smith's ("Plaintiffs") Motion for Adverse Inference Under Fed.R.Civ.P. 37(c). (Dkt. #272). After reviewing the pleadings and holding oral argument on March 18, 2009, the Court issues the following order.

//

1    **I.    BACKGROUND**

2        **A.    Procedural History**

3            This is a civil racketeering suit against the above-named Defendants.  On

4    September 19, 2005 Plaintiffs Peter Marceau, Jon Bodine, Rhonda McKinney, Brian Pine

5    and Kathryn Smith ("Plaintiffs") filed a Complaint against Defendants, asserting several

6    claims arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

7    18 U.S.C.A. § 1962, *et seq.*, and the Labor Management Reporting and Disclosure Act of

8    1959 ("LMRDA"), 29 U.S.C. § 186(a) and (b) [Section 302 of the Labor Management

9    Relations Act ("LMRA")] (Compl. ¶¶ 85-131 (Dkt. #1)).  Plaintiffs amended their

10   Complaint on August 15, 2006 (First Amend. Compl. ("FAC") (Dkt. #46)), then again

11   after the close of discovery, on April 23, 2008 (Second Amend. Compl. ("SAC") (Dkt.

12   #231)).  Plaintiffs' Second Amended Complaint eliminated all but two claims: (1) a RICO

13   claim against Defendants Dex (and previously Qwest) ("Corporate Defendants"), and

14   individual Defendants Ortega-Matson and Wheeler ("Union Agents") under 18 U.S.C.

15   1962(c) (Count I), and (2) a RICO conspiracy claim against Defendants Dex, Qwest,

16   Union Agents, and Defendant International Brotherhood of Electrical Workers Local

17   1269 ("Union")  under 18 U.S.C. 1962(d) (Count II).  (SAC ¶¶ 51-62).  On May 22,

18   2009, Defendants moved for summary judgment on both of Plaintiffs' civil RICO claims.

19   (Dkt. #s 256, 257).

20       **B.    Factual Background**

21           Plaintiffs are former or current "premise" sales representatives employed by

22   Corporate Defendants in their Phoenix and/or Mesa, Arizona offices.  (Plaintiffs'

23   Statement of Facts ("PSOF") ¶¶ 2-14 (Dkt. #274); Union Defendants' Statement of Facts

24   ("UDSOF") ¶ 1) (Dkt. #244); Defendants' Responsive Statement of Facts ("DRSOF") ¶¶

25   2-14 (Dkt. #284)).  Premise sales representatives ("premise representatives" or "sales

26   representatives") sell high-dollar Yellow Page advertising to select customers.  (PSOF ¶

27   20).  During the relevant time period, Corporate Defendants published yellow page

28   telephone directories for, among other locales, various cities in Arizona.  (UDSOF ¶ 2).

1    They also offered similar services on the internet.  (Id.).  Defendant Qwest owned and ran

2    operations from July 2, 2000 until January 31, 2006.  (Id. ¶ 3).  Defendant Dex owned and

3    ran operations from September 9, 2003 until January 31, 2006.  (Id. ¶ 4).

4         Individual Defendants Ortega-Matson and Wheeler were also employed by

5    Corporate Defendants as premise sales representative throughout the relevant time period.

6    (UDSOF ¶ 8).  In addition, Ortega-Matson and Wheeler served as Union representatives:

7    Ortega-Matson served as vice chair, chairperson, and executive board member from the

8    early 1980s to 2008; Wheeler served as union chairperson for the Phoenix and Mesa

9    offices from approximately 1999 to 2005.  (PSOF ¶¶ 16, 19; UDSOF ¶¶ 9, 24, 33).  The

10   Union maintains its headquarters in San Francisco, California, and during all relevant

11   time periods was the collective bargaining representative of a multi-state bargaining unit

12   of the Corporate Defendants' sales personnel in Arizona and six other states.  (UDSOF ¶¶

13   6, 20).

14        Plaintiffs allege that from September 20, 2001 to January 31, 2006, "Defendant

15   Dex (and previously Qwest) and the Union, along with the Union Agents, acted in concert

16   to manipulate the calculation of sales performance and commissions and the account

17   assignment functions so that [the] Union agents would receive extraordinary

18   compensation not justified by their sales performance."  (SAC ¶ 1).  And, "[b]ecause

19   sales personnel are evaluated, rewarded and disciplined based on their sales performance

20   in comparison with that of other salespersons, any improper advantage to one salesperson

21   injures others."  (Id.).  Plaintiffs also allege that "profitable accounts were improperly

22   diverted from the Plaintiffs and assigned to Ms. Ortega-Matson and Mr. Wheeler."  (Id.).

23   Plaintiffs allege that Defendants' actions – account write-offs and downward revenue

24   adjustments, preferred terms for customers of Union Agents, improper account

25   assignment, improper packages, double commissions, unearned workflow credits, and no

26   exclusion from new connects and reassigned accounts for Union Agents (Id ¶¶ 20-45) –

27   constituted preferential treatment in violation of Section 186 of the LMRDA, which

28   prohibits employers from offering, and union and their agents from accepting, "things of

1    value." (Id. ¶ 2).  Plaintiffs allege that such preferential treatment given to the Union

2    Agents economically injures all other sales personnel, including Plaintiffs.  (Id. ¶ 47).

3    Plaintiffs seek an award of damages, costs, and reasonable attorneys' and expert witness

4    fees.  (Id., p.21).

5    **II.    STANDARD OF REVIEW ON SUMMARY JUDGMENT**

6           Summary judgment is appropriate when the "pleadings, depositions, answers to

7    interrogatories, and admissions on file, together with the affidavits, if any, show that there

8    is no genuine issue as to any material fact and that the moving party is entitled to a

9    judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial

10   burden of establishing the absence of any genuine issue of material fact.  Celotex Corp. v.

11   Catrett, 477 U.S. 317, 323 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir.

12   2001).  Specifically, the moving party must present the basis for its motion and identify

13   those portions of the record that demonstrate the absence of a genuine issue of material

14   fact.  See, e.g., Nissan Fire & Marine Ins. Co. v. Fritz Co., 210 F.3d 1099, 1105 (9th Cir.

15   2000) ("A moving party may not require the nonmoving party to produce evidence

16   supporting its claim or defense simply by saying that the nonmoving party has no such

17   evidence.") (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 609 (11th Cir. 1991)

18   ("Even after Celotex it is never enough simply to state that the non-moving party cannot

19   meet its burden at trial.")).

20          A material fact is one that might affect the outcome of the case under governing

21   law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In addition, a

22   "genuine" issue means that a reasonable jury could find in favor of the non-moving party.

23   Id.; Anheuser -Busch, Inc. v. Natural Beverage Distrib., 69 F.3d 337, 345 (9th Cir. 1995).

24          On a motion for summary judgment, the Court views the evidence in the light most

25   favorable to the nonmovant.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir.

26   1995).  The Court may not make credibility determinations or weigh conflicting evidence.

27   Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).  In addition, the Court must draw

28

1    all reasonable inferences in favor of the nonmovant.  Gibson v. County of Washoe, 290

2    F.3d 1175, 1180 (9th Cir. 2002).

3            If the moving party meets its burden with a properly supported motion for

4    summary judgment, then the burden shifts to the non-moving party to present specific

5    facts that show there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushia Elec.

6    Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  The nonmovant may not rest on

7    bare allegations or denials in his pleading, but must set forth specific facts, by affidavit or

8    as otherwise provided by Rule 56, demonstrating a genuine issue for trial.  Fed.R.Civ.P.

9    56(e); Anderson, 477 U.S. at 248-49.

10           The nonmovant has the burden of identifying with reasonable particularity the

11   evidence that it believes precludes summary judgment.  Id.; see Carmen v. San Francisco

12   Unified School District, 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if the evidence in

13   the record is later found to create a genuine issue of material fact, a district court may

14   grant summary judgment if the opposing party's papers do not include or conveniently

15   refer to that evidence).  A district court is not required to probe the record in search of a

16   genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).

17           In addition, conclusory allegations, unsupported by factual material, are

18   insufficient to defeat summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

19   1989).  The mere existence of a scintilla of evidence supporting the nonmovant's petition

20   is insufficient; there must be enough evidence from which a trier of fact could reasonably

21   find for the non-movant.  Anderson, 477 U.S. at 251-52 ("[T]he inquiry . . . is . . . whether

22   the evidence presents a sufficient disagreement to require submission to a jury or whether

23   it is so one-sided that one party must prevail as a matter of law.").  The nonmovant "must

24   do more than simply show that there is some metaphysical doubt as to the material facts."

25   Matsushita Elec., 475 U.S. at 586.

26   **III.     ADMISSIBILITY OF EVIDENCE ON SUMMARY JUDGMENT**

27           **A.     Governing Legal Standards**

28

1   "To survive summary judgment, a party does not necessarily have to produce

2   evidence in a form that would be admissible at trial, as long as the party satisfies the

3   requirements of Federal Rules of Civil Procedure 56." Block v. City of Los Angeles, 253

4   F.3d 410, 418-19 (9th Cir. 2001).  Rule 56(e) "requires that affidavits submitted in

5   support of a motion for summary judgment must: (1) be made on the personal knowledge

6   of an affiant who is competent to testify to the matter stated therein, (2) must state facts

7   that would be admissible in evidence, and (3) if the affidavit refers to any document or

8   item, a sworn or certified copy of that document or item must be attached to the

9   affidavit." Boyd v. City of Oakland, 458 F.Supp.2d 1015, 1023 (N.D. Cal. 2006)

10  (citations omitted).  Thus, "[a] declarant must show personal knowledge and competency

11  to testify [as to] the facts stated." Id. (citing Bank Melli Iran v. Pahlavi, 58 F.3d 1406,

12  1412 (9th Cir. 1995)).

13         In other words, "[t]he matters must be known to the declarant personally, as

14  distinguished from matters of opinion or hearsay"; "[a] declarant's mere assertions that he

15  or she possesses personal knowledge and competency to testify are not sufficient." Id.

16  (citing Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999 (9th Cir. 1990)).  "Rather, in

17  accordance with Rule 56(e), a declarant must show personal knowledge and competency

18  "'affirmatively,' . . . for example, by the nature of the declarant's position and nature of

19  participation in [the] matter.'" Harris Technical Sales, Inc. v. Eagle Test Systems, Inc.,

20  2008 WL 343260, at *2 (D. Ariz. 2008) (quoting Boyd, 458 F.Supp.2d at 1023).

21         **1.    The Parties' Statements of Fact**

22         Amongst themselves, the parties have filed three statements of facts *and* three

23  separate "objections" to each others' statements of facts.  See Dkt. #s 239, 244, 271, 273,

24  274, 284.

25         First, LRCiv 56.1 does not authorize a party to file separate objections to a

26  statement of facts.  LRCiv 56.1 requires a party filing a motion for summary judgment to

27  file a statement "setting forth each material fact on which the party relies in support of the

28

motion." LRCiv 56.1(b) then requires a party opposing a motion for summary judgment to file a statement setting forth:

> (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party. Each additional fact shall be set forth in a separately numbered paragraph and shall refer to a specific admissible portion of the record where the fact finds support.

LRCiv 56.1(b) does not permit the nonmoving party to file two separate pleadings; the nonmoving party may file only one pleading, which first addresses the moving party's statement of facts and then supplements those facts with additional facts in support of the non-moving party's opposition to summary judgment. Plaintiffs did not comply with this requirement when they filed an Additional Statement of Facts in Support of Plaintiffs' Response to Defendants' Motions for Summary Judgment (Dkt. #274) separate from Plaintiffs' Responses and Objections to Defendants' Statements of Facts (Dkt. #s 271, 273).

In addition, the Court is aware that "[d]efects in evidence submitted in opposition to a motion for a summary judgment are waived 'absent a motion to strike or other objection.'" FDIC v. N.H. Ins. Co., 953 F.2d 478, 484 (9th Cir.1991) (quoting Scharf v. U.S. Att'y Gen., 597 F.2d 1240, 1243 (9th Cir. 1979)). However, LRCiv 56.1(d), which permits the moving party to file a reply memorandum, does not permit the moving party to file a separate responsive memorandum to any additional facts in the non-moving party's separate statement of facts. Instead, LRCiv 7.2(m)(2) requires that "[a]ny response to the objection must be included in the responding party's reply memorandum for the underlying motion and may not be presented in a separate responsive memorandum." Therefore, Defendants' Objections to Plaintiffs' Additional Statement of Facts (Dkt. #284) are improper.

Second, LRCiv 56.1 "does not permit explanation and argument supporting the party's position to be included in the . . . statement of facts. Argument may be made in

1   the response or reply brief on the motion for summary judgment, but within the page

2   limits." Pruett v. State, 2009 U.S. Dist. LEXIS 13825, at *23-24 (D. Ariz. 2009).  Both

3   of Plaintiffs' Responses and Objections (Dkt. #s 271, 273) and Defendants' Objections

4   (Dkt. #284) are riddled with explanation and argument.  Especially troubling is the fact

5   that Defendants not only waited until their reply memorandum to attack both the Moss &

6   Barnett Report and Plaintiffs' expert's testimony as inadmissible, but failed to include

7   any argument concerning the admissibility of that evidence in the reply itself; that

8   argument is found only in Defendants' Objection to Plaintiffs' Additional Statement of

9   Facts (Dkt. #284, ¶¶ 40, 61).

10  Finally, many of the parties' objections are substantively unnecessary.

11  "[O]bjections to evidence . . . [as] irrelevant, speculative, and/or argumentative, or that it

12  constitutes an improper legal conclusion are all duplicative of the summary judgment

13  standard itself." Burch v. Regents of the University of California, 433 F.Supp.2d 1110,

14  1122 (E.D. Cal. 2006).  The parties' voluminous objections are sadly "representative of a

15  growing trend where 'attorneys . . . raise every objection imaginable without regard to

16  whether the objections are necessary, or even useful, given the nature of summary

17  judgment motions in general, and the facts of their cases in particular.'" Harris Technical

18  Sales, 2008 WL 343260, at *2 (quoting Burch, 433 F.Supp.2d at 1120).

19      **2. The Moss & Barnett Report and Plaintiffs' Expert Testimony**

20  To establish a genuine issue of material fact, Plaintiffs rely in large part on the

21  Moss & Barnett Report[1] and the report and testimony of their expert witness, Bradley

22

23  _____

    [1]The Report is formally titled "DEX MEDIA, INC. REPORT ON AUDIT OF
24  PHOENIX OPERATIONS CONDUCTED BETWEEN APRIL 28, 2004 AND NOVEMBER
    20, 2004."  (PSOF Ex. 21).  The Report is composed of 59 pages of text with additional
25  pages containing "NOTES TO PHOENIX AUDIT REPORT." (PSOF Ex. 56). Part A of the
    Report, "BACKGROUND OF THE AUDIT," explains that the Report followed a long
26  history of allegations of "account manipulation" and "unfair labor practices" in Defendant
    Dex's (and formerly Qwest's) Phoenix sales office.  (PSOF Ex. 21, p.1).  Part B of the
27  Report, "PURPOSE OF THE AUDIT," explains that Defendant Dex commissioned the audit
28  "to determine whether (a) the allegations of manipulation of business processes by sales

1   Preber ("Preber").  (Dkt. #270, p.55).  Defendants argue, in their Objections to Plaintiffs'

2   Additional Statement of Facts (Dkt. #284), that both the Moss & Barnett Report and

3   Preber Report are inadmissible hearsay that Plaintiffs may not rely on to create a genuine

4   issue of material fact.  (Dkt. #284, ¶¶ 40, 61).  Defendants also argue that "under

5   Fed.R.Evid. 702, Preber is unqualified to offer the conclusions made in his expert reports

6   and deposition testimony."  (Id., ¶ 61).

7       The Court "may only consider admissible evidence in ruling on a motion for

8   summary judgment."  Ballen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006)

9   (citation omitted).  However, "[a]t the summary judgment stage, [courts] do not focus on

10  the admissibility of the evidence's form.  We instead focus on the admissibility of its

11  contents."  Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing, *inter alia*,

12  N.H. Ins. Co., 953 F.2d at 485 ("[T]he nonmoving party need not produce evidence in a

13  form that would be admissible at trial in order to avoid summary judgment.") (internal

14  quotation marks and citation omitted)).  Accordingly, the Court need not decide whether

15  the Moss & Barnett and Preber Report are themselves admissible at trial.  See id. at 1036

16  ("It would be sufficient if the contents of the diary are admissible at trial, even if the diary

17  itself may be inadmissible.").

18      First, the Court notes that Plaintiffs rely on a number of the "findings" or

19  conclusions in the Moss & Barnett Report to establish a genuine issue of material fact that

20  Union Agents received preferential treatment in certain specific instances.  (See Dkt.

21  #270, p.54; Dkt. #274, *passim*).  However, Defendants argue that the Report is

22  inadmissible hearsay.  (DRSOF ¶ 40).  Although Defendants are correct that the Report is

23  not admissible as a business records under Fed.R.Evid. 803(6), see Paddack v. Dave

24  Christensen, Inc., 745 F.3d 1254, 1259 (9th Cir. 1984), it appears that the Report may be

25  admissible as a admission by a party-opponent under Fed.R.Evid. 801(d)(2)(C), see, e.g.,

26  _____

27  representatives, and (b) the domination of office procedures by union adherents to their
    advantage and to the disadvantage of non-union employees, were accurate or unfounded."
28  (Id., p.3).

1    Reid Bros. Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1307 (9th Cir. 1983);

2    Banks v. U.S., 78 Fed. Cl. 603, 617 (Fed. Cl. 2007).  Rule 801(d)(2)(C) provides that a

3    statement does not constitute hearsay if it is offered against a party and is "a statement by

4    a person authorized by the party to make a statement concerning the subject."  It appears

5    that Corporate Defendants specifically authorized Moss & Barnett to investigate the

6    subject matter of the Report and then issue the Report.  Defendants assert, without

7    support, that "[t]he report is not a party admission because Dex hired Moss & Barnett to

8    provide an independent, nonbinding opinion."  (DRSOF ¶ 40).  However, that assertion,

9    even if true, appears only to establish that the Report might not be admissible under

10   Fed.R.Evid. 801(d)(2)(D), as it would not qualify as "a statement by the party's agent or

11   servant concerning a matter within the scope of the agency or employment."  As such, the

12   Court cannot conclude at this time that the Report is inadmissible.

13         In addition, the Court need only determine on summary judgment whether the

14   contents of the Moss & Barnett Report are admissible.  Defendants argue generally in

15   their Objections to Plaintiffs' Additional Statement of Facts that "[t]he report contains

16   multiple levels of hearsay and comprises allegations made by unidentified employees, the

17   majority of which are unfounded, speculative, and not based on employees' personal

18   knowledge or the facts."  (Dkt. #284, ¶ 40).  Based on the Court's review, the Moss &

19   Barnett Report does generally avoid reference to specific employees' names and makes

20   general conclusions about the investigators' findings.  However, to the extent that certain

21   statements or conclusions in the Report refer to specific accounts and other like evidence,

22   and are not based on double hearsay, then it appears that such statements can be admitted

23   into evidence, and the Court may consider them on summary judgment.

24         Second, Plaintiffs appear to rely heavily on the testimony and report of their

25   expert, Bradley Preber, to create a genuine issue of material fact in opposition to

26   summary judgment.  (Dkt. #270, p.54).  However, Defendants argue that Preber's Report

27   is inadmissible hearsay.  (Dkt. #284, ¶ 61).  But to the extent that the Preber Report

28   constitutes hearsay, it would appear that Preber could testify to all the relevant portions of

1    his report from personal knowledge, Fed.R.Evid. 602, or at the very least use the report to

2    refresh his recollection, Fed.R.Evid. 612.  In addition, to the extent that Defendants

3    contend that Preber's testimony and the contents of his Report is based on inadmissible

4    hearsay, "[t]he facts or data in the particular case upon which an expert bases an opinion

5    or inference . . . need not be admissible in evidence."  Fed.R.Evid. 703.

6           Naturally, however, Defendants argue that Preber's testimony is inadmissible

7    under Fed.R.Evid. 702 because it is based on "unsupported speculation and subjective

8    beliefs."  (Dkt. #284, ¶ 61).  Under Rule 702, expert testimony is admissible if the

9    testimony "will assist the trier of fact to understand the evidence or to determine a fact in

10   issue."  Fed.R.Evid. 702.  "Whether testimony is helpful within the meaning of Rule 702

11   is in essence a relevancy inquiry."  Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1184

12   (9th Cir. 2002) (citation omitted).  U.S. v. 99.66 Acres of Land, 970 F.2d 651, 657 (9th

13   Cir. 1992).  Thus, "[d]istrict courts exercise broad discretion in admitting and excluding

14   expert testimony, and proffered testimony is properly excluded when foundational facts

15   demonstrating qualification are absent."  LuMetta v. United States Robotics, Inc., 824

16   F.2d 768, 771 (9th Cir. 1987).  But the Fed.R.Evid. 702 inquiry is not squarely before the

17   Court.  Defendants' objections were not raised until their reply memorandum (and the

18   argument improperly made in Defendants' Objections to Plaintiff's Additional Statement

19   of Facts), and Plaintiffs have not had a sufficient opportunity to respond.  Regardless, "in

20   most cases, objections to the inadequacies of [an expert's study / report] are more

21   appropriately considered an objection going to the weight of the evidence rather than its

22   admissibility."  Hemmings, 285 F.3d at 1188; see Bazemore v. Friday, 478 U.S. 385, 400

23   (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not

24   its admissibility.").  Thus, the Court will consider Preber's expert testimony at this stage.

25   **IV.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

26          On May 22, 2009, the Corporate and Union Defendants filed Motions for

27   Summary Judgment on Plaintiffs' claims that Defendants violated of Sections 1962(c)

28

1  and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  (Dkt.

2  #s 256, 257).

3      Section 1962(c) provides:

4      It shall be unlawful for any person employed by or associated with any
       enterprise engaged in, or the activities of which affect, interstate or foreign
5      commerce, to conduct or participate, directly or indirectly, in the conduct of
       such enterprise's affairs through a pattern of racketeering activity or
6      collection of unlawful debt.

7  18 U.S.C. § 1962(c).  A "plaintiff only has standing [under § 1962(c)] if, and can only

8  recover to the extent that, he has been injured in his business or property by the conduct

9  constituting the violation."  <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 495

10 (1985).  In addition, "[t]o state a claim under § 1962(c), a plaintiff must allege '(1)

11 conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  <u>Odom v.</u>

12 <u>Microsoft Corp.</u>, 486 F.3d 541, 547 (9th Cir. 2007) (quoting <u>Sedima</u>, 473 U.S. at 496);

13 <u>see also</u> <u>Living Designs, Inc. v. E.I. Dupont de Nemours and Co.</u>, 431 F.3d 353, 365 (9th

14 Cir. 2005) ("The elements of a civil RICO claim are as follows: '(1) conduct (2) of an

15 enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5)

16 causing injury to plaintiff's 'business or property.'") (quoting <u>Grimmett v. Brown</u>, 75

17 F.3d 506, 510 (9th Cir. 1996)).

18     Section 1962(d) provides:

19     It shall be unlawful for any person to conspire to violate any of the
       provisions of subsection (a), (b), or (c) of this section.
20
21 18 U.S.C. § 1962(d).  "[S]ection 1962(d) makes it unlawful to conspire to conduct or

   participate in the conduct of an enterprise's affairs, where its affairs are conducted
22
   through a pattern of racketeering activity."  <u>U.S. v. Tille</u>, 729 F.2d 615, 619 (9th Cir.
23
24 1984).  To state a claim under § 1962(d), a plaintiff need only supply "[p]roof of an

25 agreement the objective of which is a substantive violation of RICO (such as conducting

   the affairs of an enterprise through a pattern of racketeering)."  "The illegal agreement
26
   need not be express as long as its existence can be inferred from the words, actions, or
27
28 interdependence of activities and persons involved."  <u>Oki Semiconductor Co. v. Wells</u>

1   Fargo Bank, Nat. Ass'n, 298 F.3d 768, 775 (9th Cir. 1002).  Id.  However, when proof of

2   such an agreement is lacking, "the evidence must establish the defendant's participation

3   or agreement to participate in two predicate offenses."  Tille, 729 F.2d at 619.

4          **A.    Statute of Limitations**

5          Defendants contend that Plaintiffs' RICO claims are barred by the statute of

6   limitations.  (Dkt. #s 257, p.28; 256, pp.10; 283, pp. 3-10).  Civil RICO actions are

7   subject to a four-year statute of limitations.  See Tanaka v. First Hawaiian Bank, 104

8   F.Supp.2d 1243, 1245 (D. Haw. 2000) ("In the absence of a statutory limitations period,

9   the Supreme Court has determined by case law that a four-year limitations period applies

10  to civil RICO actions.") (citing Agency Holding Corp. v. Malley-Duft & Assocs., Inc.,

11  483 U.S. 143, 156 (1987) (imposing the Clayton Act's four-year limitations period for

12  civil enforcement actions on RICO civil enforcement actions)).

13         Plaintiffs filed their original Complaint on September 19, 2005.  (Dkt. #1).

14  Therefore, per the applicable four-year limitations period, Plaintiffs' RICO claims must

15  not have accrued prior to September 20, 2001; otherwise, as Defendants argue, Plaintiffs'

16  claims are barred by the statute of limitations.[2] [3]  Unsurprisingly then, Plaintiffs seek

17

18         [2]"Even if Plaintiff's RICO claims are otherwise barred, equitable tolling could still
19  save the claims."  Tanaka, 104 F.Supp.2d at 1252.  Here, Plaintiffs made no reference to the
    doctrine of equitable tolling in their original Complaint, and thus the Court found on
20  Defendants' Motion to Dismiss that "Plaintiff waive[d] any such tolling argument."  Dkt. #
    38 (July 7, 2006 Order), at p.11.  Plaintiffs subsequently amended their Complaint (twice),
21  adding, among other things, allegations of "equitable estoppel/tolling."  Dkt. #46, p.24; Dkt.
    #231, p.18.  However, the Court notes that Plaintiffs make no argument concerning equitable
22  estoppel in their Response to Defendants' Motions for Summary Judgment.  Dkt. #270, pp.
23  17-29.

24         [3]Plaintiffs appear to suggest that the Court revisit its July 7, 2006 order holding that
25  the "separate accrual rule" does not apply to Plaintiffs' claims in light of two subsequent,
    unpublished cases.  (Dkt. #270, p.21 n. 1).  The separate accrual rule provides that a new
26  cause of action accrues for each "new and independent act" and "new and accumulating
    injury" even though the RICO violation causing the injury happened outside the four-year
27  statute of limitations.  Grimmett, 75 F.3d at 510, 513 (citation omitted).  In Molus v. Swan,
28  the Southern District of California held that separate false billings constituted new bills,

1    damages only for alleged events occurring after September 20, 2001.  See SAC, ¶54 (Dkt.

2    231) ("From September 20, 2001 until January 31, 2006, DEX (and previously Qwest),

3    and the Union Agents conducted, participated in, engaged in, conspired to engage in . . . a

4    pattern of racketeering activity.").  However, Defendants contend that Plaintiffs' claims

5    are barred by the statute of limitations because "[e]ach Plaintiff knew or should have

6    known before September 20, 2001 of one or more transactions that (1) he/she perceived

7    as evidence of (a) Defendants' ongoing conspiracy and pattern of racketeering and (b)

8    caused injury of the same type as alleged herein."  UDSOF ¶11 (Dkt. #244) (adopting by

9    reference Corporate Defendants' Statement of Facts ("CDSOF") ¶¶ 1-29 (Dkt. #239)).

10        "The limitations period for civil RICO actions begins to run when a plaintiff

11   knows or should know of the injury which is the basis for the action."  Living Designs,

12   431 F.3d at 365; see, e.g., Rotella v. Wood, 528 U.S. 549, 553 (2000) ("[D]iscovery of

13   the injury, not discovery of the other elements of a claim, is what starts the clock.");

14   _____

15   "rather than a reaffirmation of an earlier due invoice," such that each bill "inflicted a new
     injury because it demanded money for work allegedly not performed."  2007 WL 2326132,
16   at *7 (S.D. Cal. 2007).  And in American Med. Ass'n v. United Healthcare Corp., the
     Southern District of New York held that separate, false reimbursement decisions constituted
17   new and independent injuries because they did not result from one initial event."  2006 WL
18   3833440, at *10 (S.D.N.Y. 2006).  However, American Med. would presumably re-start the
     statute of limitations every time there is more than one fraudulent act.  See id. ("[T]hese
19   multiple injuries cannot be said to have result from one initial event.").  And the fraudulent
20   acts in Molus were each entirely new billings, rather than mere reaffirmations of earlier due
     invoices.  2007 WL 2326132, at *7.  Here, despite the changes in Plaintiffs' Second
21   Amended Complaint (such as no longer calling the alleged predicate acts as a "scheme"), the
     alleged actionable conduct constituted numerous and on-going instances of preferential
22   treatment provided by Corporate Defendant to Union Agents; the acts were interrelated, all
23   part of the same alleged fraudulent purpose.  In addition, the alleged injury from each act of
     preferential treatment led to the same result, Plaintiffs' decreased compensation.  As noted
24   in the Court's July 7, 2006 order, "Plaintiffs even acknowledge[d] in their Response to the
25   Corporate Defendants' Motion to dismiss, that their injuries are based upon an accumulation
     of loss of financial compensation."  "[T]he plaintiff cannot use an independent, new predicate
26   act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place
27   outside the limitations period."  Klehr v. A.O. Smith Corp., 521 U.S. 179, 181 (1997).
     Accordingly, the Court declines to revisit its previous holding with respect to the separate
28   accrual rule.

1    Grimmet, 75 F.3d at 511 ("[W]e have faithfully followed the 'injury discovery' rule for

2    over a decade.") (citations omitted).  Thus, Plaintiffs' RICO claims accrued when

3    Plaintiffs first had actual or constructive knowledge of "the preferential treatment

4    provided to the Union Agents" by the Corporate and Union Defendants.  (Dkt. #231, ¶1).

5           "Ordinarily, [courts] leave the question of whether a plaintiff knew or should have

6    become aware of a fraud to the jury."  Beneficial Standard Life Ins. Co. v. Madariaga,

7    851 F.2d 271, 275 (9th Cir. 1988) (citations omitted).  However, "[a] plaintiff is deemed

8    to have had constructive knowledge if [he or she] had enough information to warrant an

9    investigation which, if reasonably diligent, would have led to discovery of the fraud."  Id.

10   Thus, the Court must determine whether Plaintiffs have tendered sufficient evidence to

11   raise a genuine issue of material fact as to when they knew of or should have discovered

12   that preferential treatment was being provided to the Union Agents prior to September 20,

13   2001.  See Living Designs, 431 F.3d at 365.

14          However, a limitations period does not begin to run until the cause of action is

15   complete.  Rawlings v. Ray, 312 U.S. 96, 98 (1941); see also United States v. Lindsay,

16   346 U.S. 568, 569 (1954).

17          Because a RICO cause of action cannot accrue until all the elements exist . .
            . no statute of limitations can begin to tick until a pattern exists, which will
18          not be until continuity exists and the one year usually required to establish
            continuity has already lapsed. . . . Both [the "injury discovery" and "injury
19          and pattern discovery"] accrual rules at issue here require all the elements to
            exist; neither will begin to tick until the one-year continuity delay has
20          lapsed.

21   Grimmet, 75 F.3d at 512 (citing McCool v. Strata Oil Co., 972 F.2d 1452, 1465 (7th Cir.

22   1992)) (emphasis added); cf. Rotella, 528 U.S. at 559 n. 4 ("[W]e need not and do not

23   decide whether civil RICO allows for a cause of action when a second predicate act

24   follows the injury, or what limitations accrual rule might apply in such a case.").  Thus,

25   although discovery of the injury stemming from alleged RICO violations is what begins

26   the limitations period, a plaintiff cannot know or be deemed to know of that injury until

27   all of the elements of the plaintiff's cause of action exits.  See Sedima, 473 U.S. at 497

28   ("[T]he compensable injury necessarily is the harm caused by predicate acts sufficiently

1   related to constitute a pattern, for the essence of the violation is the commission of those

2   acts in connection with the conduct of an enterprise.").  In particular, at least some

3   continuity must exist, which requires either "a series of related predicates extending over

4   a substantial period of time" or "past conduct that by its nature projects into the future

5   with a threat of repetition." H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229,

6   241-42 (1989); see Grimmett, 75 F.3d at 512 ("[C]ontinuity cannot usually be proven

7   unless the scheme has been in existence for at least one year.").  Defendants must do

8   more at summary judgment than merely point to a single predicate act of alleged

9   preferential treatment occurring prior to September 20, 2001 in order to establish that the

10  four-year statute of limitations began to run on Plaintiffs' civil RICO claims before then.

11                  1. Second Amended Complaint

12          On April 23, 2008, approximately one month before Defendants' filed their

13  Motions for Summary Judgment, Plaintiffs filed a Second Amended Complaint ("SAC").

14  (Dkt. #231).  The SAC reduces the Counts by four (from six to two) and, among other

15  things, eliminates allegations that (1) the alleged racketeering scheme may have involved

16  any union agents or representatives other than Defendants Ortega-Matson and Wheeler

17  (Dkt. #46, ¶¶ 1, 82) and (b) Plaintiffs were injured by "concessions" made in "collective

18  bargaining and day-to-day negotiations" between the Corporate and Union Defendants

19  (id., ¶101).  (Id.).

20          The parties do not dispute that "an amended pleading supercedes the original."

21  Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1546 (9th Cir. 1990);

22  see Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967) ("The amended complaint supercedes

23  the original, the latter being treated as non-existent.").  However, Defendants now object

24  to the SAC because "Plaintiffs attempt to plead around the statute of limitations by

25  deleting certain time-barred injuries alleged in their initial Complaint and First Amended

26  Complaint."  (Dkt. #256, p.5).  Defendants argue that "[t]he Federal Rules of Civil

27  Procedure do not allow for such creative pleading."  (Dkt. #283, p.3) (citing Fed.R.Civ.P.

28  15(b)).  Defendants also state that the Court should not accept the narrowed allegations in

- 16 -

1  the SAC because they are inconsistent with Plaintiffs' Original and First Amended

2  Complaints.  (Id., p.4 n. 2) (citing Bradley v. Chiron Corp., 136 F.3d 1317, 1325-26 (Fed.

3  Cir. 1998) ("[T]he [C]ourt [is] not required to accept as true the inconsistent allegations in

4  the second amended complaint.")).

5        First, the Court notes that on April 16, 2008, Defendants stipulated to a

6  modification of the Court's Rule 16 Scheduling Order so that Plaintiffs could file their

7  SAC "to clarify the specific issues in the case"; no objection was raised at that time.

8  (Dkt. #209).  Second, Fed.R.Civ.P. 15(b) only permits the amendment of pleadings to

9  conform to the evidence when the parties expressly or impliedly consent to the *trial* of

10 unpled issues.  See, e.g., Consolidated Data Terminals v. Applied Digital Data Systems,

11 Inc., 708 F.2d 385, 396 ("Federal Rule of Civil Procedure 15(b) embodies a liberal policy

12 in favor of allowing pleading amendments at any time during and even after trial. . . .

13 [unless] they cause substantial prejudice to the opposing party.") (citations omitted).

14 Third, while the Court is certainly not required to accept as true inconsistent allegations in

15 the Plaintiffs' SAC, the SAC is not necessarily inconsistent with Plaintiffs' earlier

16 complaints.  Although the earlier complaints appeared to contemplate that the alleged

17 racketeering scheme may have included union agents other than Defendants Ortega-

18 Matson and Wheeler and referenced alleged injuries stemming from "collective

19 bargaining," there is nothing in the SAC that contradicts Plaintiffs' earlier allegations;

20 Plaintiffs' SAC simply narrows the scope of Plaintiffs' allegations.  Plaintiffs'

21 amendments indicate, at most, that for purposes of their RICO claims they do not believe,

22 nor allege at this time, that the racketeering scheme involved union agents other than

23 Ortega-Matson or Wheeler, or that Plaintiffs were injured from lax collective bargaining

24 (and other events) as part of that scheme prior to September 20, 2001.  (Dkt. #270, pp. 22-

25 23, 28-29).

26        Regardless, Defendants are clearly entitled to attempt to establish both that the

27 alleged racketeering scheme involved union agents other than Defendants Ortega-Matson

28 and Wheeler, and that events outside of the statute of limitations support the proposition

that Plaintiffs knew or should have known of their injuries prior to September 20, 2001; a limitations defense does not rely on the particular allegations contained in any given complaint. As such, the Court will consider Defendants arguments that certain events not alleged in the SAC began to run the limitations period prior to September 20, 2001.[4] In addition, although Plaintiffs submit declarations that they did not discover any injury from the alleged racketeering scheme until sometime after September 20, 2001 (see, e.g., Declaration of Brian Pine, Dkt. #264, ¶14), to the extent that those declarations are unsupported and contradicted by deposition testimony, those statements must be deemed merely conclusory, and thus insufficient to establish a genuine issue of material fact. See Taylor, 880 F.2d at 1045.

### 2. Collective Bargaining Agreement

Defendants argue that "all of Plaintiffs' claims are time-barred because they [originally] allege[d] injuries from bargaining concessions that were known (or should

---

[4]Plaintiffs contend that

[a]ny examples offered by Defendants that Plaintiffs knew of injury from preferential treatment during the US West-instituted O[mbudsman] R[eview] C[ommittee] period (1997 to July 2001) simply do not relate to the racketeering scheme alleged by Plaintiffs that arose in the Phoenix and Mesa offices as a result of Qwest disbanding the ORC while contemporaneously giving Van Horne sufficient local autonomy that Ortega and Wheeler could manipulate her (and her successors) into giving them preferential treatment while denying it to Plaintiffs.

(Dkt. #270, pp. 20-21). However, as Defendants point out, Van Horne was the Sales Director from March 2000 to March 2004, both during and after the ORC period. (PSOF ¶¶ 44-45). In addition, the Sales Performance Evaluation ("SPE") system was used from 1997 to 2004, and the CBA was the same throughout the ORC period. (PSOF ¶¶ 41, 86, 123). Furthermore, Plaintiffs acknowledge that the National Labor Relations Board ("NLRB") approved Qwest and the Union's petition to disband the ORC on the ground that the prior alleged illegalities which resulted in the appointment of the ombudsman had been permanently abandoned." (FAC ¶ 21). Thus, Plaintiffs' pre-ORC / post-ORC distinction appears to be a somewhat arbitrary barometer for determining whether preferential treatment in fact took place prior to September 20, 2001.

1    have been known) to them in 1998 when the relevant [Collective Bargaining Agreement]

2    became effective."  (Dkt. #256, p.9).  However, despite some of Plaintiffs'

3    acknowledgment of "lax labor contract provisions" in the 1998-2006 Collective

4    Bargaining Agreement ("CBA"), Defendants provide no evidence to establish that

5    Plaintiffs were in fact injured by any provisions in the CBA.  First, Defendants make no

6    claim that Plaintiff Marceau ever testified that he knew of, or was injured from, lax

7    provisions in the CBA.  (CDSOF ¶25).  Second, although the other Plaintiffs testified that

8    certain provisions in the CBA were lax, that does not somehow establish that "Plaintiffs

9    knew or should have known that they were injured by bargaining concessions and/or lax

10   provisions when [the] CBA was executed in 1998."  (Dkt. #256, pp. 9-10).  The relevant

11   question is *when* did each Plaintiff discover his or her injury, not when do Plaintiffs allege

12   or acknowledge that certain predicate acts took place.  See Tanaka, 104 F.Supp.2d at

13   1249 ("The focus is on the 'injury,' not on the predicate acts and not on the fraud.").

14   Plaintiffs' testimony that certain provision in the CBA were lax, as well as the fact that

15   the CBA "was a well-publicized, easily accessible document" (Van Horne Decl. ¶14),

16   does not establish that Plaintiffs knew or should have known *in 1998* of the lax provisions

17   in the CBA, let alone that they were in fact injured by those provisions.

18        In addition, the Court is not convinced that lax CBA provisions and bargaining

19   concessions are sufficiently related to Plaintiffs' alleged racketeering scheme –

20   preferential treatment given by Corporate Defendants to particular Union Agents (and

21   denied to other employees) – to constitute a predicate act for purposes of Plaintiffs' civil

22   RICO claims.  See Dkt. #270, pp. 28-29; see also Ticor Title Ins. Co. v. Florida, 937 F.2d

23   447, 451 (9th Cir. 1991) ("[R]acketeering predicates [must] 'have the same or similar

24   purposes, results, participants, victims, or methods of commission, or otherwise are

25   interrelated by distinguishing characteristics and are not isolated events.'") (quoting H.J.,

26   Inc., 492 U.S. at 240).  Accordingly, the Court cannot find that Plaintiffs' testimony that

27   certain CBA provisions that were adopted in 1998 are lax bars Plaintiffs' claims under the

28   statute of limitations.

1                    3. Peter Marceau

2            Corporate Defendants contend that Marceau's RICO claims are barred by the

3    statute of limitations because he stated that the Union failed to help him address an

4    unsatisfactory performance review with Dex in 1996, and thus, Defendants contend,

5    Marceau discovered that he was injured by "perfunctory representation of grievants" in

6    1996.  (Dkt. #256, p.8).  In addition, Union Defendants contend that Marceau's claims are

7    also barred because "[Marceau] admitted he filed a charge with the National labor

8    Relations Board alleging that the Employer had granted preferential treatment to Union

9    representatives '[s]ince in [sic] or about September 1999.'"  (Dkt. #243, p.28).

10           Defendants citations to Plaintiffs' First Amended Complaint are improper;

11   Plaintiffs' Second Amended Complaint does not allege injury based on "perfunctory

12   representation of grievants."  See, e.g., Hal Roach Studios, Inc. v. Richard Feiner & Co.,

13   896 F.2d 1542, 1546 (9th Cir. 1990) ("[A]n amended pleading supercedes the original.");

14   Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967) ("The amended complaint supercedes the

15   original, the latter being treated as non-existent."); but see Bradley., 136 F.3d at 1325-26

16   ("[T]he [C]ourt [is] not required to accept as true the inconsistent allegations in the

17   second amended complaint.").  In addition, any injury stemming from "perfunctory

18   representation of grievants" does not appear sufficiently related to the sort of injury

19   stemming from the alleged preferential treatment given by the Corporate Defendants to

20   the Union Agents, loss of compensation or opportunity.  Furthermore, there is no

21   evidence or allegation that the Union Agents received any sort of preferential treatment as

22   a result of the Union's alleged failure to assist Marceau in addressing his unsatisfactory

23   performance review with Dex in 1996.

24           Furthermore, although Marceau filed charges with the National Labor Relations

25   Board in 2003, and alleged that Union agents and representatives had received

26   preferential treatment since 1999 (Beeson Decl., Exh. C), that statement does not

27   establish *when* Marceau learned of the alleged preferential treatment or when Marceau

28

1    learned that he was being injured as a result of that treatment.  Accordingly, Defendants

2    have not established that Marceau's RICO claims are barred by the statute of limitations.

3                        4. Rhonda McKinney

4           Corporate Defendants contend that McKinney's RICO claims are barred by the

5    statute of limitations because McKinney testified that she had been injured prior to

6    September 2001 when the Phillips & Lyon account was improperly assigned to Defendant

7    Ortega-Matson.  (Dkt. #256, p.9).  McKinney's deposition testimony establishes that

8    McKinney believed the assignment of the Phillips & Lyon account to Ortega-Matson

9    injured McKinney by negatively affecting her Sales Performance Evaluation ("SPE")

10   score.  (McKinney Dep. at 161:1-13 (Blanchard Decl., Ex. 14)).  It also establishes that

11   she knew that she had been injured at the time the assignment was made.  (Id.).  However,

12   the deposition testimony does not establish *when* McKinney learned that the Phillips &

13   Lyon account had in fact been assigned to Ortega-Matson; only that she learned it had

14   been assigned to Ortega-Matson sometime after May 2001.  (Id. at 156:6-157).  Thus, the

15   Court cannot conclude at this time that McKinney knew or should have known that she

16   had been injured prior to September 2001 as a result of preferential treatment afforded to

17   Ortega-Matson due to improper account assignment.

18          In addition, as stated above, the 1998 CBA is not sufficiently related to the alleged

19   racketeering scheme and thus cannot constitute an initial predicate act with respect to

20   Plaintiffs' civil RICO claims.  Defendants point to no other racketeering predicate that

21   occurred prior to September 20, 2001.  Accordingly, there is a genuine issue of material

22   fact as to whether McKinney knew or should have known of the injury from the Phillips

23   & Lyon account – the sort of injury which is the basis for her civil RICO claims – prior to

24   September 2001.

25                       5. Brian Pine

26          Corporate Defendants contend that Pine's civil RICO claims are barred by the

27   statute of limitations because Pine testified that he had been injured prior to September

28

1  2001 when Dex management was improperly assigning accounts to Union steward Mike

2  Avila.  (CDSOF ¶¶ 11-13).

3       Pine's deposition testimony establishes that in 2000 Pine believed that union

4  steward Mike Avilla was improperly being assigned valuable accounts, and that those

5  assignments injured him by affecting his SPE evaluation and made him ineligible for a

6  promotion.  (Id.; PSOF ¶¶ 97-100).  Plaintiffs, on the other hand, argue that the

7  preferential treatment afforded to Mike Avilla in 2000 does not constitute a racketeering

8  predicate for purposes of Pine's civil RICO claims because (1) Pine was employed by

9  U.S. West in 2000, (2) Pine was employed in telephone sales, not premise sales, and (3)

10  the racketeering predicates must be restricted to instances of preferential treatment

11  afforded to Defendants Ortega-Matson and Wheeler.  First, Pine's employer is technically

12  irrelevant in this case; as Defendants point out, local management remained the same

13  before and after U.S. West and Qwest merged, and Plaintiffs were evaluated by the same

14  standards (the SPE system).  (PSOF ¶¶ 41, 44-45, 86).  Second, as discussed above,

15  although Plaintiffs' Second Amended Complaint restricts its allegations concerning scope

16  of Defendants' alleged RICO violations, and specifically limits the alleged Union Agents

17  to Ortega-Matson and Wheeler, nothing prevents Defendants from submitting evidence to

18  establish that the alleged scheme included Union agents other than those named in the

19  SAC.

20       However, Plaintiffs' claims are limited to preferential treatment given by

21  Corporate Defendants to Union representatives (and denied to other employees) within

22  the premise sales department; the victims of the alleged racketeering scheme do not

23  include telephone sales representatives.  (Dkt. #270, pp. 22-23) ("Plaintiffs' entire SAC

24  focuses exclusively on the preferential treatment *premise sales* management gave the top

25  two *premise sales* Union agents in the *premise sales* department.") (emphasis in original).

26  Although Defendants point out that the telephone and premise sales departments had the

27  same management and were represented by the same Union (DOPSOF ¶¶ 21, 23), it is

28  undisputed that the employees within the premise sales and telephone sales departments

1    were not the same.  Thus, the fact that Pine and Avilla were employed in telephone sales,

2    instead of premise sales, appears to place the instant alleged preferential treatment outside

3    the scope of Plaintiffs' alleged racketeering scheme.  See Ticor, 937 F.2d at 451 (stating

4    that racketeering predicates must have, among other things, the same or similar victims).

5    In addition, Avilla never received the promotion, and thus was not afforded preferential

6    treatment.  (PSOF ¶ 102).

7         Defendants point to no other racketeering predicate with respect to Pine's civil

8    RICO claims that occurred prior to September 20, 2001.  Accordingly, the Court cannot

9    conclude that the statute of limitations bars Plaintiff Pine from asserting his RICO claims.

10                        5. Kathee Smith

11        Corporate Defendants contend that Smith's civil RICO claims are barred by the

12   statute of limitations because Smith discovered that she had been injured prior to 2001

13   when she (1) complained in 1997 "that the SPE results were inaccurate because Ortega-

14   Matson had been improperly credited with the full amount of 'workflow' points

15   throughout 1996," (2) stated in a 2001 affidavit to the NLRB that she "disputed a decision

16   by local management to award sales commission and performance credit to a Union agent

17   that was clearly in violation of policy as it pertained to the assignment of accounts," (3)

18   submitted a written complaint to DEX on or before May 16, 2001, alleging that "a Union

19   steward, Mark Romero, was allowed to improperly maintain a packaged account in

20   violation of Dex policies," and (4) submitted a written complaint in November 1996

21   questioning "the treatment of advertisers assigned to Union Agents and IBEW members

22   as compared to the treatment of [her] customers."  (Dkt. #256, pp. 6-7) (citing CDSOF ¶¶

23   1-10).

24        Plaintiffs, on the other hand, argue that (1) Smith was not injured in 1997 by

25   Ortega-Matson's improper workflow credits because the workflow score "had no bearing

26   – or, significant bearing" on the SPE, (2) the May 16, 2001 complaint and the 2001

27   NLRB affidavit describe the same event, and that event did not injure Smith because

28   Defendants "properly disassociated" the account after Smith's complaint to the

1    Ombudsman Review Committee, and (3) Smith was not injured in 1996 by advertising-

2    related preferential treatment because Defendants "investigated [her complaint],

3    expunged Smith's discipline, and 'fixed' the Union agents' accounts to ensure fair and

4    equitable treatment, all to Smith's satisfaction."  (Dkt. #270, pp. 18-20) (citing PSOF ¶¶

5    86-96).

6         As discussed above, the Court notes that "[w]hile a plaintiff need not be aware of

7    all of the elements of a RICO claim in order for the limitations period to start running, a

8    plaintiff must know that the defendant has injured his property."  Bulletin Displays, LLC

9    v. Regency Outdoor Advertising, Inc., 518 F.Supp.2d 1182, 1187-88 (C.D. Cal. 2007).  In

10   addition, "concerns about [Defendant's] bad intention do not equate to an actual injury for

11   purposes of a statute of limitations analysis."  Id. at 1188.  As such, the Court must

12   determine whether Smith's complaints were merely "concerns" or whether they establish

13   that she knew that she was injured by Defendants' preferential treatment to Union Agents.

14        Although Smith's 1997 complaint was based on an initial belief that Ortega-

15   Matson's workflow ratings were improper and may have had an effect on the SPE, which

16   would have affected Smith's SPE point ranking, Smith testified that "[i]t was determined

17   that once the SPE numbers were recalculated, it made no difference as to the point

18   scores."  (Smith Dep. at 257:23-258:1 (PSOF, Ex. 5)).  Smith agreed with that

19   determination.  (Id. at 258:7).  As such, the evidence does not support a finding that Smith

20   was injured in 1997 as a result of Ortega-Matson's allegedly improper workflow ratings.

21        However, Smith's testimony does establish that she believed that she had been

22   injured in 1996 when her SPE score was negatively affected "by the policy criteria and

23   restrictions in advertising not being applied equally to [her] customer [sic] and the

24   advertisers assigned to [Ortega-Matson] and Dick Gaynes."  (Id. at 246:19-249:25).

25   Smith's 1996 complaint was not merely a "concern"; she complained that she was injured

26   as a result of an act of preferential treatment afforded to, among others, Ortega-Matson.

27   The statement of facts (and the deposition testimony referenced therein) cited by

28   Plaintiffs do not establish that Smith believed the Ombudsman Review Committee had

1    "investigated, expunged Smith's discipline, and 'fixed' the Union agents' accounts" with

2    respect to Smith's 1996 complaint.

3         In addition, Smith's May 16, 2001 written complaint and January 2001 NLRB

4    affidavit, as well as her deposition testimony, establish that Union steward Mark Romero

5    improperly maintained an account that Smith had been required to work on.  (Id. at

6    129:25-130:24; CDSOF ¶ 5).  And contrary to Plaintiffs' contentions, the fact that Smith

7    stated that the account was "properly disassociated" does not establish that Smith knew

8    she was not injured by "improper commission and performance credit" given to Mark

9    Romero prior to the time that the account was disassociated.  The deposition testimony

10   referenced in Plaintiffs' Statement of Facts, paragraphs 59 and 89 through 93, does not

11   establish that "the Company investigated, expunged Smith's discipline, and 'fixed' the

12   Union agents' accounts to ensure fair and equitable treatment, all to Smith's satisfaction"

13   (Dkt. #270, p.20); that statement is an incorrect reflection of the referenced testimony.  In

14   addition, the evidence does not merely establish that Smith "saw a system error and

15   reported it."  (Dkt. #270, p.19).  Smith stated that "[w]hen accounts are assigned to a rep

16   inappropriately, whether they are packaged or assigned separately from the package, it

17   harms other sales reps within that universe."  (CDSOF ¶ 7).  As such, the evidence

18   supports that Smith knew or should have known prior to September 20, 2001 that she was

19   injured by Romero's improperly maintained account; subsequent disassociation of an

20   improperly packaged account does not eliminate the fact that an injury occurred.[5]

21

22        [5]Plaintiffs' Response makes multiple references to "unremediated preferential
23   treatment." For example, like Smith, Plaintiffs state that "Pine did not know that he was
     injured *by any unremediated preferential treatment* in the premise sales department until
24   after the SOL period began."  (Dkt. #270, p.23) (emphasis added).  However, despite
     Plaintiffs' counsel's contentions to the contrary at oral argument, the fact that Defendants
25   allegedly took remedial actions relates at most to the issue of equitable tolling (discussed
26   below), not the elements of Plaintiffs' civil RICO cause of action.  That Corporate
     Defendants may have disassociated improper packages or "assured" Plaintiffs at certain times
27   that they had "fixed" Union agents' improper account assignments, among other things, does
28   not somehow negate the fact that preferential treatment took place or negate the fact that

1    Both the 1996 and 2001 incidents qualify as predicate acts for the purpose of

2    Smith's claims.  18 U.S.C. § 1961(1) ("'[R]acketeering activity' means . . . any act which

3    is indictable under [Section 302 of the Labor Management Relations Act] (dealing with

4    restrictions on payments and loans to labor organizations) . . .").  However, "while two

5    acts are necessary, they may not be sufficient" as "two isolated acts of racketeering

6    activity do not constitute a pattern."  <u>Sedima</u>, 473 U.S. at 497 n. 14.  In order to form a

7    pattern, relatedness and continuity must exist between the predicate acts.  <u>Id.</u>; <u>see</u>

8    <u>Religious Technology Center v. Wollersheim</u>, 971 F.3d 364, 366 (9th Cir. 1992).  The

9    racketeering predicates must be related and pose a threat of continued activity.  <u>H.J., Inc.</u>,

10   492 U.S. at 239.  Here, both the fact that "the policy criteria restrictions in advertising

11   applied to [Smith's] customer were not applied to the advertisers assigned to [Ortega-

12   Matson] . . . even though management was advised of the disparity" (Smith Dep. at

13   248:25-249:9), and the fact that Smith had been required to work on part of Union

14   steward Mark Romero's improperly packaged account prior to it being disassociated

15   before 2001 are not isolated acts; both amount to instances where Union representatives

16   were given preferential treatment by the Corporate Defendants to the detriment of Smith.

17   In addition, the occurrence of the second predicate act appears sufficient to establish a

18   threat of repetition, i.e., that there might be future instances in which the Corporate

19   Defendants afford Union representatives preferential treatment.  As such, there is

20   sufficient evidence to establish that Smith's civil RICO cause of action was complete

21   prior to September 2001, and that Smith knew or should have known of the injuries

22   stemming from the alleged preferential treatment that was being provided to the Union

23   representatives by Corporate Defendants prior to September 2001.  Thus, Plaintiff

24   Smith's RICO claims are barred by the statute of limitations.

25          6. John Bodine

26

27   _____

28   Plaintiffs were injured by such treatment.

1     Corporate Defendants contend that Bodine's civil RICO claims are barred by the

2 statute of limitations because Bodine discovered his injury prior to 2001 when (1) he

3 discovered in the mid-1990s that the Haffner & Allegruchi ("Haffner") account was

4 improperly serviced by Defendant Ortega-Matson, a Phoenix premise representative,

5 instead of a Mesa premise representative, and (2) he was asked to work on some of

6 Ortega-Matson's accounts even though he did not receive the commissions from those

7 accounts.  (Dkt. #256, p.8).  In addition, Union Defendants contend that Bodine knew of

8 his injury prior to 2001 because he testified that the SPE system had unfairly benefitted

9 Union representative since the mid-1990s and because he filed an unfair labor practice

10 charge with the NLRB alleging that the Union had treated him unfairly since March 2000.

11 (Dkt. #243, p.28).

12     First, the Union Defendants' contentions are not dispositive as they do not

13 establish *when* Bodine discovered that he was being injured by the SPE system or the

14 Union's unfair treatment.  Second, however, with respect to Corporate Defendants'

15 contentions, Bodine's deposition testimony does establish that he believes that he was

16 harmed by preferential treatment given to the Union Agents when part of the Haffner

17 account was serviced by Defendant Ortega-Matson for a period of time in the mid-1990s.

18 (Bodine Dep. at 109:12-18 (Blanchard Decl., Ex. 12)).  Bodine testified that he was

19 injured because the entire Haffner account, and revenue derived therefrom, "should have

20 been worked from the Mesa office," instead of partially worked on by Ortega-Matson

21 after the "the sale of the firm and the split of the partnership."  (Id. at 111:1-2, 112:14-19,

22 113:2-5).  That testimony is sufficient to establish that Bodine knew or should have

23 known at the time he was assigned the Haffner account, prior to 2001, that he had lost the

24 opportunity to work the Haffner account prior to receiving it because Ortega-Matson had

25 been allowed to work the account.

26     In addition, Bodine's testimony establishes that he believes that he was harmed by

27 preferential treatment given to Ortega-Matson sometime prior to 2001 when he was

28 required to work without compensation on her accounts while she was conducting union

1    business.  (Id. at 161:12-162:12, 166:11-167:13; DRSOF ¶ 4).  Bodine stated that "people

2    were asked to work accounts in [Ortega-Matson's] absence while she was bargaining"

3    (id. at 165:2-3), indicated that he was asked to work on Ortega-Matson's accounts

4    without compensation (id. at 166:11-16), and stated that he was injured because "Karen

5    would have been provided the commission for the accounts being worked in addition to

6    whatever average earnings she was receiving for union business" (id. at 7-13).  That

7    testimony is sufficient to establish that Bodine either knew or should have known that he

8    had been harmed prior to 2001.  However, Bodine also stated that he had no knowledge

9    as to whether Ortega-Matson received compensation for the work done by other

10   representatives on her accounts.  (Id. at 166:1-10).  Defendants point to no evidence to

11   indicate whether Ortega-Matson did in fact receive compensation for work done by other

12   sales representatives as alleged by Bodine.  As such, the Court cannot conclude that the

13   mere fact that Bodine worked without commission on some of Ortega-Matson's accounts

14   constitutes preferential treatment given to Ortega-Matson; there is insufficient evidence to

15   establish that this incident constitutes a predicate act for purposes of Bodine's civil RICO

16   claim.

17        Nonetheless, as discussed above, although the statute of limitations cannot begin to

18   run unless a pattern exists, see Grimmet, 75 F.3d at 512, which requires at least two

19   predicate acts, all that is required per the injury discovery rule is the plaintiff's discovery

20   of injury stemming from a single alleged predicate act; Plaintiff need not know of the

21   existence of the required second predicate act (or any injury derived therefrom).  As such,

22   the appropriate inquiry is merely whether a second predicate act existed prior to 2001 that

23   injured Plaintiff Bodine.  Here, as discussed in reference to Plaintiff Smith, Defendants

24   have shown the occurrence of additional predicate acts prior to 2001.  However, the

25   injury associated with the 1996 incident apparently involved only the denial of certain

26   discounts and incentives for Smith's customers (Smith Dep. at 248:25-249:9); that sort of

27   injury is individual and cannot be attributable to the other Plaintiffs or non-Union

28   representative employees.  Thus, the 1996 incident cannot amount to a predicate act for

1    purposes of Bodine's civil RICO claims.  But the same is not true with respect to the

2    improper packaging of the Casa Grande account prior to it being disassociated.  As Smith

3    herself indicated, "[w]hen accounts are assigned to a rep inappropriately, whether they are

4    packaged or assigned separately from the package, *it harms other sales reps within that*

5    *universe*."  (CDSOF ¶ 7) (emphasis added).  However, the Court notes that Bodine was

6    terminated in 2000 (and reinstated sometime in 2002); he was not employed by Corporate

7    Defendants as a premise sales representative between 2000 and 2002.  (PSOF ¶ 5).  Thus,

8    Bodine cannot have been injured by the improper packaging of an account in 2001, and

9    that incident cannot constitute a predicate act for purposes of Bodine's civil RICO claims.

10       Accordingly, although Bodine knew or should have known that he had been

11   injured prior to September 20, 2001 when Ortega-Matson was allowed to improperly

12   work the Haffner account before it was assigned to Bodine and Bodine was allegedly

13   required to work without compensation on some of Ortega-Matson's accounts, there is

14   insufficient evidence to establish that the latter incident constitutes a predicate act for

15   purposes of Bodine's civil RICO claims because it is unclear whether Ortega-Matson

16   received compensation or other preferential treatment on the accounts that she was

17   allegedly not required to work.  Thus the Court cannot conclude at this time that Bodine's

18   RICO cause of action was complete prior to 2001.  Plaintiff Bodine's civil RICO claims

19   are not barred by the statute of limitations.

20       7. Equitable Tolling

21       "Equitable tolling doctrines, including fraudulent concealment, apply in civil

22   RICO cases."  Grimmet, 75 F.3d at 514; see Tanaka, 104 F.Supp.2d at 1252 ("Even if

23   Plaintiff's RICO claims are otherwise barred, equitable tolling could still save the

24   claims.").  However, "[t]he doctrine of fraudulent concealment is invoked only if the

25   plaintiff both pleads and proves that the defendant *actively* misled her, and that she had

26   neither actual nor constructive knowledge of the *facts constituting [her] cause of action*

27   despite her due diligence."  Id. (emphasis in original) (citing Volk v. D.A. Davidson &

28   Co., 816 F.2d 1406, 1415 (9th Cir. 1987) ("("The doctrine [of fraudulent concealment] is

1   properly invoked only if a plaintiff establishes 'affirmative conduct upon the part of the

2   defendant which would, under the circumstances of the case, lead a reasonable person to

3   believe that he did not have a claim for relief.'") (citation omitted); see also Rotella, 528

4   U.S. at 560-61 ("[W]here a pattern remains obscure in the face of a plaintiff's diligence in

5   seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty.").

6          As an initial matter, Plaintiffs did not plead equitable tolling in their original

7   Complaint, and thus the Court held that "Plaintiff waive[d] any such tolling argument."

8   (Dkt. # 38 (July 7, 2006 Order), at p.11).  In their First and Second Amended Complaints,

9   however, Plaintiffs included a section on "equitable estoppel/tolling."  (Dkt. #46, p.24;

10  Dkt. #231, p.18).  Nonetheless, Plaintiffs make no specific reference to equitable estoppel

11  in their Response to Defendants' Motions for Summary Judgment.  (Dkt. #270, pp. 17-

12  29).  But Plaintiffs do repeatedly refer to "unremediated preferential treatment," which

13  appears to be related to the issue of equitable tolling since Plaintiffs in effect ask the

14  Court to hold that because Corporate Defendants sometimes took remedial action after

15  incidents of preferential treatment were brought to Corporate Defendants' attention, the

16  statute of limitations does not act to bar Plaintiffs' claims despite the fact that Plaintiffs

17  knew or should have known of injury stemming from the preferential treatment.   To the

18  extent that Plaintiffs contend that such remedial measures affected their due diligence and

19  actual or constructive knowledge of the facts constituting their cause of action, that is an

20  issue for equitable tolling.

21         Nevertheless, "[t]he plaintiff must plead with particularity the circumstances

22  surrounding the fraudulent concealment and state facts showing his due diligence in

23  trying to uncover the facts."  Conerly v. Westinghouse Elec. Corp., 623 F.2d 117, 120

24  (9th Cir. 1980); see Grimmet, 75 F.3d at 514 ("Failure to plead [the allegedly concealed

25  facts] waives [the] tolling defense [of fraudulent concealment]."). Here, on the defense of

26  equitable estoppel, Plaintiffs Second Amended Complaint merely provides, in pertinent

27  part:

28

1
2
3

> Qwest and the Union Agents conspired together to fraudulently conceal the fact and effect of the actions described above so that Plaintiffs, prior to September 20, 2001, neither knew, nor in the exercise of due diligence could reasonably have known, of any wrongdoing by Qwest and the Union Agents of the types herein described.

4   (Dkt. #231, p.18).  Plaintiffs do not plead any instances of alleged preferential treatment

5   prior to September 20, 2001.  Nor do Plaintiffs specify or explain how Defendants

6   allegedly attempted to conceal the preferential treatment given by Corporate Defendants

7   to the Union Agents.  Thus, Plaintiffs have waived the equitable tolling defense of

8   fraudulent concealment, and the Court need not address the merits of Plaintiffs' tolling

9   defense and the related issue of whether remedial actions taken by Corporate Defendants

10   in response to Plaintiffs' pre-September 2001 complaints constituted active concealment

11   to prevent Plaintiffs from discovering an ongoing scheme to afford preferential treatment

12   to Union Agents.

13   **C.     RICO (Count I), 18 U.S.C. § 1962(c)**

14       RICO makes it unlawful for a person associated with an enterprise engaged in

15   interstate commerce to "participate . . . in the conduct of such enterprise's affairs through

16   a pattern of racketeering activity."  18 U.S.C. § 1962(c).

17                   1. Pattern of Racketeering Activity

18       Defendants argue that summary judgment is appropriate because (1) "all

19   compensation to Ortega-Matson and Wheeler was 'for, or by reason of, [their] service[s]'

20   for Dex, falling squarely within Section 302(c)(1)" (Dkt. #283, pp. 11-13), (2) "Plaintiffs

21   misinterpret Section 302 as a mandate that employers must give all employees the same

22   opportunities to earn compensation" (id., pp. 13-15), and (3) "Plaintiffs have not

23   presented any credible evidence supporting the alleged individual predicate acts" (id., pp.

24   15-20).

25       A "pattern of racketeering activity" is the occurrence of two or more acts of

26   racketeering activity within ten years of each other.  18 U.S.C. § 1961(5); see Brady v.

27   Dairy Fresh Products Co., 974 F.2d 1149, 1152 (9th Cir. 1992) ("A pattern of

28   racketeering activity does not exist unless there is evidence of two predicate acts.").

1   "Racketeering activity" includes, among numerous other activities, "any act which is

2   indictable under title 29, United States Code, section 186 (dealing with restrictions on

3   payments and loans to labor organizations) . . . ." 18 U.S.C. § 1961(1).  Section 302 of the

4   Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.*, makes it unlawful

5   for any employer "to pay, lend, or deliver, or to agree to pay, lend, or deliver, any money

6   or other thing of value . . . to any labor organization, or any officer or employee thereof . .

7   . ." 29 U.S.C. § 186(a)(2) [LMRA § 302(a)(2)].  The LMRA also makes it unlawful "for

8   any [employee] to request, demand, receive, or accept, or agree to receive or accept, any

9   payment, loan, or delivery of money or other thing of value prohibited by [§ 302(a) ]."  29

10  U.S.C. § 186(b)(1) [LMRA § 302(b)(1)].

11                              i. Section 186(c) Exception

12          Section 302's prohibitions do not apply with "respect to any money or other thing

13  of value payable by an employer to any of his employees . . . as compensation for, or by

14  reason of, his service as an employee of such employer[.]"  29 U.S.C. § 186(c)(2) [LMRA

15  § 302(c)(1)]; see Caterpillar, Inc. v. International Union, United Automobile, Aerospace

16  and Agricultural Implement Workers of America, 107 F.3d 1052, 1057 (3d Cir. 1997)

17  ("[U]nder § 302(c)(1), the lawfulness of the conduct *ab initio* turns on whether the

18  payment is 'owed because of . . . service as an employee.'").  In addition, Section 302's

19  prohibitions do not apply "with respect to the payment or delivery of money or other

20  thing of value in . . . in compromise, adjustment, settlement, or release of any claim,

21  complaint, *grievance*, or dispute in the absence of fraud or duress[.]"  29 U.S.C. §

22  186(c)(2) [LMRA § 302(c)(2) ] (emphasis added).  Thus, if the Union Agents received

23  their compensation or "things of value" "by reason of" their "service as employees" to

24  Dex, or received compensation in settlement of a grievance, the Union Agents'

25  compensation was lawful.

26          Most circuits "generally have concluded that Congress's use of the alternative

27  formulations 'as compensation for' or 'or by reason of' signifies two different kinds of

28  payments – the former, ordinary wages and salaries, and the latter, benefits such as

1   medical leave and a pension that are not readily susceptible to characterization as

2   'compensation.'"   International Ass'n of Machinists and Aerospace Workers, Local

3   Lodge 964 v. BF Goodrich Aerospace Aerostructures Group, 387 F.3d 1046, 1056 (9th

4   Cir. 2004) (citations omitted).  This case involves the latter kind of payments: Plaintiffs

5   allege that Dex violated Section 302 by (1) giving discounts to different accounts

6   assigned to the Union Agents, (2) providing billing adjustments to accounts assigned to

7   the Union Agents, (3) allowing accounts assigned to the Union Agents place "group"

8   advertisements in its directories, and (4) assigning certain accounts to the Union Agents

9   instead of other non-union employees.  (SAC, ¶¶ 21, 25, 30-39, 41, 45).  Defendants

10   argue that "[e]ven if [the Union Agents] indirectly received compensation as a result of

11   business decisions to provide advertising benefits to customers, that compensation was

12   'for, or by reason of' their work in selling advertising to those customers."  (Dkt. #256,

13   p.13).  Defendants also argue that "any compensation that resulted from the assignment of

14   an account to [the Union Agents] was received by reason of their actual employment and

15   work performed."  (Id.); see also Dkt. #283, pp. 11-13 ("[T]he SAC's remaining

16   allegations involve purported predicate acts that, even if committed, would not increase

17   Ortega-Matson's or Wheeler's compensation unless they sold advertising to customers.").

18         Despite Defendants' assertions, the Court cannot conclude that providing

19   discounts, refunds, and incentives to particular employees' customer accounts, when

20   unwarranted, do not constitute "things of value" under Section 302(a).  There is no

21   dispute that the Union Agents' received their compensation by selling advertising to

22   customers, the act of which constitutes "service as an employee."  However, in a

23   commission-based sales environment, allowing particular employees to give discounts,

24   refunds, and incentive to their customers' accounts provides those employees with the

25   opportunity to more easily retain customers and perhaps sell additional advertising.

26   Although those sorts of opportunities are not readily cognizable as "compensation," the

27   Court cannot conclude that simply because the Union Agents still had to sell advertising

28   to their customers to earn their commission, other employees in commission-based sales

1   would not consider those additional opportunities as "things of value."  (See, e.g., PSOF

2   ¶¶ 133-144).  That applies even more forcefully with respect to the assignment of

3   accounts: the more accounts an employee has, in addition to the type of account an

4   employee is given, the more sales, and the resulting compensation due to those sales, the

5   employee is potentially able to make.  (PSOF ¶¶ 28-35).  That sort of preferential

6   treatment – assignment of accounts, discounts, refunds, and incentives by an employer to

7   union representatives only – if unwarranted, may constitute a violation of § 302 of the

8   LMRA.[6]

9         Defendants also argue that the decision to give the accounts, discounts, refunds,

10  and incentives, to the Union Agents (and their customers) was due to "an ordinary

11  business decision that depart[ed] from internal corporate policy or practice, which in

12  some way benefit[ed] an employee who happens to be a Union representative."  (Dkt.

13  #243, p.13).  As such, Defendants argue that "creating RICO liability for every innocent

14  corporate business decision that may collaterally benefit an employee who is also a union

15  representative" (id., p.14) would run counter to the purpose of section 302, which is

16

17        [6]It is undisputed that a violation of Section 302 must be "wilful."  29 U.S.C. §
18  186(d)(2).  And "[a] 'willful' violation of 29 U.S.C. § 186 requires only that the defendant
    act with knowledge that the payments are from a person acting in the interest of an employer
19  and are intended to influence the defendant's duties as a union employee; knowledge of the
    statutory prohibition itself is not necessary."  United States v. Bloch, 696 F.2d 1213, 1216
20  (9th Cir. 1982).  As such, Union Defendants contend that Plaintiffs cannot prove that
    Defendants acted wilfully because "Wheeler and Ortega-Matson acted in the firm belief that
21  they were entitled to every payment, account, and decision in their favor because each such
    decision was based on the Employer's business needs, and not any attempt to bribe or
22  influence them as Union representatives."  (Dkt. #243, p.15).  But to establish "wilfulness"
    Plaintiffs are not required to show that Wheeler and Ortega-Matson knew they were
23  accepting things of value that were intended to influence their decisions as union employees;
    they only need to show that (1) Wheeler and Ortega-Matson knowingly accepted things of
24  value and (2) the things of value were intended to influence their duties as a union employee.
25  See U.S. v. Local 1804-1, Intern. Longshoremen's Ass'n, 812 F.Supp. 1303, 1326 (S.D.N.Y.
    1993) ("Union officers are strictly liable for accepting payments in violation of
26  Taft-Hartley."); see also U.S. v. Cody, 722 F.2d 1052, 1059 (2d Cir. 1983) ("It [is] enough
    to show that the employer paid, lent, or delivered [the thing of value] and that [the union
27  official] accepted [it].").
28

1    "concerned with corruption of collective bargaining through bribery of employee

2    representatives by employers, with extortion by employee representatives, and with the

3    possible abuse by union officers of the power which they might achieve if welfare funds

4    were left to their sole control."  Arroyo v. United States, 359 U.S.419, 425-26 (1959)

5    (footnotes omitted); see also Caterpillar Inc. v. Int'l Union, United Auto., Aerospace &

6    Agric. Implement Workers of Am., 107 F.3d 1052, 1057 (3d Cir. 1997) ("[Section 302]

7    was passed to address bribery, extortion and other corrupt practices conducted in secret.")

8    (en banc).  The Court does not necessarily disagree with the Union Defendants' position.

9          However, despite their lengthy discussion on the purpose of Section 302,

10   Defendants fail to actually identify any portions of the record that demonstrate the

11   absence of a genuine issue of material fact with respect to whether Corporate Defendants'

12   decision to give the Union Agents certain accounts or allow them to apply discounts and

13   refunds to their accounts amounted only to an "innocent corporate business decision."[7]

14   See Nissan Fire, 210 F.3d at 1105 ("Even after Celotex it is never enough simply to state

15   that the non-moving party cannot meet its burden at trial.").  The Court is aware that "in a

16   commissioned sales environment[,] . . . compensation legitimately varies widely based on

17   differences in performance."  (Dkt. #243, p.15).  And certainly Defendants may present

18

19         [7]Union Defendants assert that "[i]f Section 302 was expanded into an anti-
20   discrimination statute, it would be redundant of NLRA § 8(a)(3) and interfere with the labor
     relations scheme it sets up."  (Dkt. #283, p.14 n. 10).  Despite Union Defendants' counsel's
21   assertion to the contrary at oral argument, Union Defendants did not cite to NLRA § 8(a)(3)
     or raise this argument in their Motion; it was not raised until Defendants' Reply.  That is
22   inappropriate.  See Jiang v. Still, 2009 WL 117964, at *1 (9th Cir. 2009) ("Whatever the
     merits of this argument, though, Fan has waived it by failing to present it in her opening
23   brief.") (citation omitted).  Nonetheless, Plaintiffs' claims here are not merely that they were
     discriminated against based on their non-union status, but that Union representatives engaged
24   in a criminal scheme by accepting things of value from Corporate Defendants that were
     intended to influence the Union representatives' actions.  In addition, the Court is
25   unconvinced by the argument relegated to a footnote in Defendants' Reply that "exercise of
     jurisdiction in this area would interfere with the exclusive jurisdiction of the NLRB over
26   claims of discrimination based on union status."  See Int'l Union of Mine, Mill and Smelter
27   Workers, Local 515 v. Am Zinc, Lead & Smelting Co., 311 F.2d 656, 659-60 (9th Cir. 1963).
28

1    evidence to show that their "corporate business decision[s]" were simply based on the

2    Union Agents' strong performances as premise sales representatives.  But Defendants fail

3    to cite to evidence to that effect on summary judgment.  Accordingly, because the Court

4    must draw the all reasonable inferences in favor of the non-moving party on summary

5    judgment, the Court holds that there is a genuine issue of material fact as to whether Dex

6    gave "things of value" to the Union Agents, who consequently earned 139% more per

7    year than the average compensation of all other Phoenix premise sales representatives

8    (Dkt. #270, p.47), merely by reason of the Union Agents' service as an employee of Dex.[8]

9                              ii. Predicate Acts

10         The alleged acts of preferential treatment involve (1) the Petersen Johnson

11   account, (2) the Starving Students and A-1 Professional Movers accounts, (3) the Sunwest

12   Dental account, (4) the New West Lending account, (5) the Courtesy Leasing account, (6)

13   the William Revis account, (7) the Tots Unlimited and Sunrise Preschools accounts, and

14   (8) workflow SPE points.  (Dkt. #270, pp. 55-59; Dkt. #283, pp. 15-20).  Defendants

15   argue that there are no genuine issues of material fact to support a holding that the alleged

16   acts violated Section 302 of the LMRA and thereby constitute predicate acts for purposes

17   of RICO.

18         First, Plaintiffs contend that Ortega-Matson received preferential treatment by

19   receiving commissions on the Petersen Johnson account.  (SAC ¶ 36).  Defendants, on the

20   other hand, argue that "Ortega-Matson (1) legitimately received the Petersen Johnson

21

22         [8]The Court is not employing a burden-shifting analysis (Dkt. #283, p.14 n. 11); it is
     only holding that Defendants, as the moving party on summary judgment, have not met their
23   burden to demonstrate the absence of a genuine issue of material fact as to whether the Union
     Agents received "things of value" by reason of their service as employees or whether the
24   "things of value" amounted to bribery in violation of Section 302.  But see U.S. Mabry, 518
     F.3d 442, 446 (6th Cir. 2008 ("Section 186(c) provides nine exceptions which serve as
25   affirmative defenses to liability under § 186(a)-(b).").  Plaintiffs have identified that the
     Union Agents received "things of value" and that their compensation was above-average.
26   Defendants did not cite to evidence to negate a reasonable inference that the Union Agents
     compensation was due in part to those "things of value," as opposed to other factors, such
27   as better sales performance.
28

1   account through the assignment rotation after Todd McKenna was terminated, and (2)

2   received the commission on the account in settlement of a grievance."  (Dkt. #283, p.15).

3          Defendants point to Ortega-Matson's declaration that she was "next up"on the

4   assignment rotation to receive the Petersen Johnson account.  (Ortega-Matson Decl., ¶¶ 3-

5   4).  In response, however, Plaintiffs cite to Smith *and* Preber's testimony that Smith was

6   "next in line" to receive the account.  (PSOF ¶¶ 245-46).  Smith based her testimony on

7   information that she allegedly received from Brenda Preuss ("Preuss").  (Smith Dep. at

8   pp. 116:10-117:12 (PSOF, Ex. 5)).  Although hearsay, presumably Preuss could confirm

9   her alleged statement at trial.  And contrary to Defendants' contention, Preuss's

10  deposition testimony does not establish that Preuss "denied any knowledge of who would

11  have received the account."[9]  (DRSOF ¶ 245).  Therefore, there is a question of fact as to

12  whether Ortega-Matson "legitimately received" the Petersen Johnson account.  In

13  addition, there is no dispute that Ortega-Matson filed a grievance to receive the full

14  commission on the Petersen Johnson account, despite the fact that Tod McKenna also

15  received commissions on that account.  (PSOF ¶¶ 219, 223).  However, although "at least

16  three Dex management employees" confirmed that Ortega-Matson filed a grievance, they

17  did not testify as to the circumstances surrounding the actual settlement of her grievance.

18  Instead, Plaintiffs supply sufficient evidence to question whether "fraud or duress" was in

19  any way involved in Corporate Defendants' decision to settle the grievance and allow

20  Ortega-Matson to receive commissions on the account.  (PSOF ¶¶ 219, 222-237, 244-47).

21  Thus, a genuine issue of material fact exists as to whether the Petersen Johnson account is

22  a predicate act.

23

24          [9]In the cited testimony, Preuss was asked "Johnson Petersen, how about that account?"
    She replied: "You mean Petersen Johnson? . . . I remember the name of that account and
25  perhaps talk about that account.  Without looking at the paperwork, I don't know.  I believe
    a couple of those were big CMOs that were written off and then advertising was put back in.
26  I think there was special privileges, advertising programs, perhaps on those.  Again, if you
    look in the documents, you'll see."  (Preuss Dep. at 128:16-129:2 (Blanchard Supp. Decl.,
27  Ex. H)).

28

1    Second, Plaintiffs contend that Wheeler received preferential treatment with

2  respect to the packaging[10] of the Starving Students and A-1 Professional Movers

3  accounts.  Defendants argue that "Plaintiffs do not present any admissible evidence to

4  overcome . . . evidence . . . that Wheeler received [the Starving Students and A-1

5  Professional Movers] account already packaged, and had it unpackaged after discovering

6  this fact."  (Dkt. #283, p.16).

7    Wheeler testified that the two accounts were packaged before he received them,

8  and that once he realized the accounts were improperly packaged he moved to

9  disassociate the accounts.  (Wheeler Dep. at 160:1-12 (PSOF, Ex. 7); Wheeler Dep. at p.

10  102 (Beeson Decl., Ex. L)).  However, Plaintiffs point out that Wheeler could not recall

11  when he received the accounts; just that he received the Starving Students account after

12  another employee, John King, retired.  (PSOF ¶ 251).  Plaintiffs also point to the fact that

13  the A-1 Professional Movers account became part of the Starving Students package as a

14  new customer on April 7, 2004.  (PSOF ¶ 252).  Importantly,  Linda Traylor ("Traylor"),

15  a fellow employee, testified that Wheeler and his manager, Neal Petersen, came to her "to

16  figure out how to get [A-1 Professional Movers] assigned to [Wheeler]."  (Traylor Dep. at

17  60:22-61:25).  That is sufficient to establish a question of fact as to whether the accounts

18  were improperly packaged after Wheeler received them; in other words, whether Wheeler

19  received the Starving Students account before April 7, 2004 (i.e., before the accounts

20  were packaged).  (PSOF ¶ 251).  In addition, Plaintiffs point to the fact that the accounts

21  were not disassociated until sometime after November 11, 2004 (PSOF ¶ 254), despite the

22  fact that Traylor testified that she told Wheeler and his manager prior to that time that

23  Wheeler was not allowed to have the A-1 Professional Movers account because A-1

24  Professional Movers was a Denver customer.  (Id.).  Therefore, a genuine issue of

25

26    [10]A "packaged account" is an account that "the customer identified should be handled
27  with his/her main account" (PSOF ¶ 248); such accounts contain more than one location and
   telephone number, which is permitted as long as the businesses share common ownership
28  (Dkt. #243, p.13).

1   material fact exists as to whether the packaging of the Starving Students and A-1

2   Professional Movers accounts constitutes a predicate act for purposes of Plaintiffs' civil

3   RICO claims.

4           Third, Plaintiffs contend that Wheeler received preferential treatment when

5   Defendants "permitted [him] to package a group of unrelated dentists" in a single account

6   (the Sunwest Dental account).  (SAC ¶ 41).  Defendants argue that "Plaintiffs present no

7   admissible evidence disputing Wheeler's . . . testimony that the various telephone

8   numbers appearing in the ad were in fact for locations under common ownership."  (Dkt.

9   #283, p.17).

10          In support of their motion, Defendants point to Wheeler's testimony that the

11  Sunwest Dental account included only dental practices that shared common ownership.

12  (Wheeler Decl., ¶¶ 74-75 (Dkt. #249)).  It is undisputed that accounts are properly

13  packaged if the advertisers share common ownership.  (Dkt. #283, p.16; Dkt. #270, p.56).

14  To that effect, Plaintiffs merely state that "Defendants ignore record evidence strongly

15  suggesting that Wheeler's dental customers were separate business entities."  (Dkt. #270,

16  p.56).  Plaintiffs cite to their expert's statement that he "analyzed records that support

17  Defendant Wheeler received payment for the improperly packaged Sun West Account"

18  (PSOF, Ex. 38 ¶ 44), and Marceau's deposition testimony that he reviewed advertising

19  orders for Wheeler's dental accounts and called some of the related businesses to see if

20  they shared common ownership; they said they did not (PSOF ¶ 262).  But Plaintiff's

21  expert did not opine that the Sunwest Dental account was improperly packaged; he only

22  stated that Wheeler received payment for that account.  In addition, Marceau's testimony

23  that individuals at various dental practices informed him over the phone that they were

24  not associated with one another also appears to constitute inadmissible hearsay.

25  (Marceau Dep. at 84:9-86:10 (PSOF, Ex. 1)).  Nonetheless, Plaintiffs also cite to the

26  Moss & Barnett Report, which cited to Wheeler's dental advertisers as an example of

27  "business[es] with separate identities grouped together in a single package."  (PSOF ¶

28  261).  Thus, there is sufficient evidence to establish that a genuine issue of material fact

1    exists as to whether Wheeler was permitted to improperly package unrelated dentists in

2    the Sunwest Dental account, and thus whether this incident constitutes a predicate act for

3    purposes of RICO.

4            Fourth, Plaintiffs allege that Defendants allowed Ortega-Matson to place losses

5    associated with the New West Lending account on a "manager's code."  (SAC ¶ 26).

6    However, Defendants argue that Plaintiffs ignore the fact "that *both* the gains and losses

7    for [the New West Lending] account were put on a manager's code."  (Dkt. #283, p.17)

8    (emphasis in original).  Plaintiffs respond that "by providing Ortega with protection from

9    losses, the Company allowed Ortega to maintain her falsely inflated compensation."

10   (Dkt. #270, p.57).  Plaintiffs also point to Lucy Van Horne's ("Van Horne") November 9,

11   2007 deposition testimony that she could not think of any situations from 2000-04 where

12   it would have been permissible for a sales representative to move a loss on their accounts

13   to a manager's code.  (Van Horne Dep. at 275:24-276:6 (PSOF, Ex. 8)).  However, on

14   November 30, 2007, Van Horne testified that Defendants placed losses received by all

15   sales representatives due to late account reassignments on a manager's code.  (Id. at

16   140:1-141:16).  That testimony referenced specific emails, dated 2003, between Van

17   Horne and others concerning the placement of losses on manager's codes for accounts

18   worked by both union and non-union representative employees.  (Dkt. #283, pp. 17-18).

19   Those emails establish not only that losses for accounts that had been reassigned late to

20   other sales representatives were also "worked on the managers [sic] code" (Van Horne

21   Decl., Ex. 3 (Dkt. #241)), but that both losses and gains from the New West Lending

22   account were placed on a manager's code (id., Exs. 1 & 2).  Although Plaintiffs point to

23   the Moss & Barnett Report, which cites New West Lending account as evidence that in

24   some cases there was an "improper transfer" of loss to a manager's code (PSOF ¶¶ 268,

25   271), the notes also indicate that both losses and gains were placed on a manager's code

26   and appear to confirm that Kellie Caperton had losses from an account placed on a

27   manager's code.  (PSOF Ex. 56, § 18, p.17; DRSOF ¶ 267).  Although "protection from

28   losses" could constitute a "thing of value,"in light of the evidence presented, the Court

1   cannot conclude that there is a genuine issue of material fact as to whether Defendants

2   violated Section 302 of the LMRA in this instance.  Thus, the placement of Ortega-

3   Matson's gains and losses from the New West Lending account on a manager's code does

4   not constitute a RICO predicate act.

5          Fifth, Plaintiffs allege that Wheeler received preferential treatment because a loss

6   in advertising on the Courtesy Leasing account was not reflected in his SPE score when

7   the account stopped advertising with Dex.  (SAC ¶ 27).  "Any change to SPE rankings for

8   the Phoenix universe could change the ordering of the 'rotation lists' used to assign new

9   accounts and reassign existing accounts to Phoenix premise rep[resentative]s."  (Van

10  Horne Decl., ¶ 10 (Dkt. #241)).  Defendants argue that "Plaintiffs present no admissible

11  evidence to overcome Defendants' evidence that under Dex policy, SPE scores of

12  premise rep[resentative]s are not affected if an account disconnects its phone line or goes

13  out of business."  (Dkt. #283, p.18).  To support their contention Defendants cite to Van

14  Horne's statement that "where a premise rep was unable to sell advertising in a future

15  book because the existing customer had gone out of business or disconnected its phone

16  line(s), such losses would not have been reflected in the assigned premise rep's SPE

17  score."  (Van Horne Decl., ¶13).  Plaintiffs, however, respond that "Corporate Defendants

18  fail to cite a policy that supports their assertion," and thus "[t]he reason for and equity of

19  the Courtesy Leasing adjustment can only be decided by the jury."  (Dkt. #270, pp. 57-

20  58).

21         Van Horne's statement is insufficient.  "Conclusory affidavits that do not

22  affirmatively show personal knowledge of specific facts are insufficient."  Casey v.

23  Lewis, 4 F.3d 1516, 1527 (9th Cir. 1993); see also FTC v. Publ'g Clearing House, Inc.,

24  104 F.3d 1168, 1171 (9th Cir. 1997).  Without citation to a specific policy or other

25  evidence, the issue becomes one of credibility, and credibility determinations are reserved

26  for the jury, see Musick v. Burke, 913 F.2d at 1394.  Thus, the Court cannot conclude at

27  this time that Defendants' decision to adjust the billing on the Courtesy Leasing account

28

1  so that Wheeler's SPE score was not negatively affected does not constitute a predicate

2  act for purposes of RICO.[11]

3       Sixth, Plaintiffs similarly allege that Ortega-Matson received preferential treatment

4  because Defendants adjusted billing on the William Revis account to zero so that a

5  decrease in any advertising purchased would not negatively affect her SPE score.  (SAC ¶

6  28).  Defendants, however, contend that "[s]imilar to the handling of the Courtesy

7  Leasing account, Defendants' evidence establishes that, consistent with Dex policy,

8  Ortega-Matson's SPE was not affected when the William Revis account went out of

9  business."  (Dkt. #283, p.18).  Again, Defendants rely solely on Van Horne's conclusory

10  statement concerning Dex policy.  Thus, for the reasons stated above, the Court cannot at

11  this time hold that Defendants' decision to adjust the billing on the Revis account so that

12  Ortega-Matson's SPE score was not negatively affected does not constitute a predicate act

13  for purposes of RICO.

14       Seventh, Plaintiffs allege that Union agents received the full allotment of workflow

15  points even when they failed to meet workflow requirements, which had the effect of

16  "adjusting upwardly the benchmark for determining whether other salespersons' sales

17  performance is deemed unsatisfactory."  (SAC ¶ 44).  Defendants contend that "Plaintiffs'

18  evidence does not establish that any Union Representative missed two or more

19  checkpoints in one quarter."  (Dkt. #283, p.19).

20       Workflow, the management of workload and timely reporting of accounts, is a

21  component of an employee's SPE score that is determined based on "various data

22  including computer-generated reports, the sales manager's inspection of account

23

24       [11]Defendants state that "[e]ven if the Courtesy Leasing adjustment were contrary to
25  Dex's written policy, . . . Section 302 is [not] violated when an employer violates its own
   policy."  (Dkt. #283, p.18 n. 15).  However, that statement is only true insofar as an employer
26  is an equal-opportunity violater.  In other words, an employer's repeated violations of its
   policies could presumably violate Section 302 if the violations constitute "things of value"
27  (such as, here, no negative effect on the employee's SPE score) and occur only for  union
28  representatives.

documents and/or discussion with the premise rep[resentative]s." (Van Horne Decl., ¶ 11 (Dkt. #241)). Phoenix workflow guidelines stated that "sales rep[resentative]s were to be removed from the new connect list[12] if they missed two or more workflow checkpoints in one quarter." (PSOF ¶ 284). However, Van Horne testified that whether a representative was in fact removed was "discretionary based off the needs of the business and what's going on at that time." (Van Horne Dep. at 186:6-16 (PSOF, Ex. 8)). In addition, Plaintiffs point to testimony from Brenda Preuss that numerous accounts were assigned to Union representatives despite the fact that they had not met workflow. (PSOF ¶¶ 135-140). Marceau also testified that he reviewed computer-generated reports for Ortega-Matson and discovered that although she missed checkpoints she nonetheless received the maximum point award for workflow. (PSOF ¶ 297). Defendants argue that such testimony is insufficient to show preferential treatment because workflow was based on a number of factors. (Dkt. #283, p.20). However, Defendants fail to mention any specific factors that could rebut the inference that preferential treatment was given in the instances raised by Plaintiffs. As such, a genuine issue of material fact exists concerning whether Defendants' improperly used their "discretion" in determining the Union Agents' workflow points and assignment of accounts therefrom, and the Court cannot conclude at this time that the assignment of workflow points does not constitute a RICO predicate act.

Finally, Plaintiffs argue that "a dispute of fact regarding whether Ortega or Bodine would have been assigned the Tots Unlimited / Sunrise Preschools account after Sunrise Preschool bought Tots Unlimited." (Dkt. #270, p.59). However, it appears that Defendants assigned the combined account to Ortega-Matson pursuant to a local policy of assigning merged accounts to the sales representative that handled the higher-revenue account; Ortega-Matson handled the higher-revenue account. (Dkt. #283, p.20; Dkt. #270, p.59; PSOF ¶¶ 128, 132). Nevertheless, Plaintiffs point out that Defendants later

---

[12]The new connect list is a "rotation list" that is used by local management to assign new accounts and reassign existing accounts to sales representatives. (Van Horne Decl., ¶ 10; PSOF ¶ 283).

1   discovered that their policy "did not adhere to corporate Market Assignment Guidelines,"

2   which directed that "accounts should have been assigned based on point of contact," not

3   revenue.  (PSOF ¶¶ 131, 132).  And, Plaintiffs argue, "management did nothing to correct

4   the error that favored Ortega."  (Dkt. #270, p.59).  But Plaintiffs submit no evidence to

5   support that assertion; or evidence to show that Defendants only assigned accounts under

6   the established policy to union representatives.  The evidence before the Court is

7   insufficient to establish genuine issue of material fact as to whether the Tots Unlimited

8   and Sunrise Preschools combined account was improperly assigned to Ortega-Matson.

9   Accordingly, the Court cannot hold that this assignment constitutes a RICO predicate act.

10          In sum, there is sufficient evidence to establish that genuine issues of material fact

11   exist with respect to whether acts surrounding the following constitute preferential

12   treatment in violation of Section 302 of the LMRA: (1) the Petersen Johnson account, (2)

13   the Starving Students and A-1 Professional Movers accounts, (3) the Sunwest Dental

14   account, (4) the Courtesy Leasing account, (5) the William Revis account, and (6)

15   workflow SPE points.  Thus, at this time, those acts may constitute predicate acts for

16   purposes of Plaintiffs' civil RICO claims, and in turn could allow Plaintiffs to establish a

17   pattern of racketeering activity.

18               2. Injury

19          Defendants contend that Plaintiffs cannot establish that the alleged preferential

20   treatment proximately caused their alleged damages.  (Dkt. #283, p.22).  Specifically,

21   Defendants argue that (1) Plaintiffs suffered no direct injury (id., pp. 26-29), (2) "RICO

22   provides no remedy for Plaintiffs' 'lost opportunities'" (id., pp. 22-26), and (3) "the

23   damages calculation would require a speculative, uncertain inquiry to determine any

24   indirect harm [Plaintiffs] suffered" (id., pp. 29-31).  Plaintiffs, on the other hand, argue

25   that (1) there is substantial evidence of the fact of direct injury (2) their damages flow

26   directly from the alleged predicate acts, and (3) they have provided a reasonable method

27   to determine the amount of damages (under which there is no risk of multiple recoveries).

28   (Dkt. #270, pp. 29-46).

1      To prevail on their civil RICO claims, Plaintiffs must prove that Defendants

2  caused injury to their business or property.  18 U.S.C. § 1964(c) ("Any person injured in

3  his business or property by reason of a violation of section 1962 of this chapter may sue

4  therefor in any appropriate United States district court.").  This element includes two

5  closely intertwined components: "First, a civil RICO plaintiff must show that his injury

6  was proximately caused by the [prohibited] conduct. Second, the plaintiff must show that

7  he has suffered a concrete financial loss." Fireman's Fund Ins. Co. v. Stites, 258 F.3d

8  1016, 1021 (9th Cir. 2001) (citation omitted); see Knutson v. Daily Review, Inc., 548

9  F.2d 795, 811 (9th Cir. 1976) ("Proof of the fact of damage is closely intertwined with

10  proof of causation.").

11      Turning to the second component first, "[t]o demonstrate injury for RICO

12  purposes, plaintiffs must show proof of concrete financial loss, and not mere injury to a

13  valuable intangible property interest." Chaset v. Fleer/Skybox Intern., LP, 300 F.3d

14  1083, 1086-87 (9th Cir. 2002) (citation omitted); see also Price v. Pinnacle Brands, Inc.,

15  138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or to an

16  'intangible property interest' is not sufficient to confer RICO standing.").  However, the

17  Court notes that plaintiffs are not required to show a "property right" in lost wages (or

18  other thing of value), by showing that they were promised or contracted for higher wages,

19  to establish a cognizable injury under RICO.  Mendoza v. Zirkle Fruit Co., 301 F.3d

20  1163, 1168 n. 4 (9th Cir. 2002).  "[R]ather, what is required is . . . a legal entitlement to

21  business relations unhampered by schemes prohibited by the RICO predicate statutes."

22  Id. (citing, *inter alia*, Chaset, 300 F.3d at 1087); accord Diaz v. Gates, 420 F.3d 897, 899

23  (9th Cir. 2005) ("We held this property interest sufficient to provide standing under

24  RICO.").

25      Here, Plaintiffs contend that they were injured in their property by lost

26  compensation ("lost wages").  (Dkt. #270, p.36).  That is true to the extent that Plaintiffs

27  contend that they (and their fellow non-union employees) were injured through improper

28  account assignments and workflow points (e.g., the Peterson account, the Starving

1   Students and A-1 Professional movers accounts, and workflow SPE points).  Those "lost

2   assignment opportunities," of which Plaintiffs have submitted sufficient proof (see

3   above), constitute a cognizable injury for purposes of RICO – those predicate acts

4   allegedly hampered Plaintiffs' legal entitlement to business relations.  But in large part,

5   Plaintiffs' alleged injuries stem from "lost post-assignment opportunities," not simply lost

6   wages due to improper account assignments and workflow manipulation.  (Dkt. #270, pp.

7   36) ("Plaintiffs cite over 118 examples of lost opportunities in [ ] post-assignment

8   categories [such as loss write-off, packaging/group advertising, double commissions, and

9   discounts].").  That damages theory – that particular form of lost opportunity – appears

10  quite novel in the context of civil RICO (or at the very least, quite unique), and in the end

11  somewhat untenable.  (Dkt. #243, pp. 28-29).

12          There are two general aspects to Plaintiffs' allegations of post-assignment

13  preferential treatment: giving things of value to Union Agents in violation Corporate

14  Defendants' policies, and giving things of value that did not violate policy.  However, the

15  former does not amount to a cognizable injury under RICO; those predicate acts had no

16  effect on Plaintiffs' business relations (or compensation) because had the predicate acts

17  not occurred, the policies would still have existed.  In those instances, Plaintiffs'

18  allegations are not that Corporate Defendants' violation of its policies harmed Plaintiffs'

19  business relations, but simply that no employees should have received such treatment.

20  Cognizable lost opportunity requires more: "the purpose of a civil RICO award is to

21  return the plaintiff to the same financial position he would have enjoyed absent the illegal

22  conduct."  Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech.,

23  Inc., 886 F.Supp. 1134, 1146 (S.D.N.Y. 1995).  In Bridge v. Phoenix Bond & Indem. Co.,

24  the defendants engaged in mail fraud, and had they not, the plaintiffs would have obtained

25  the opportunity to acquire valuable liens; there was a defined, concrete lost opportunity in

26  the plaintiffs' business relations.  128 S.Ct. 2131, 2138 (2008).  ("[R]espondents lost the

27  opportunity to acquire valuable liens.  Accordingly, respondents were injured in their

28  business or property by reason of petitioners' violation of § 1962(c)).").  Here, to the

1   extent that Plaintiffs' complain of post-assignment preferential treatment that occurred as

2   a result of a violation of corporate policies, that treatment had no effect on Plaintiffs'

3   business relations, i.e., the alleged injury stemmed from the policy, and not the violation.

4            That reasoning does not similarly apply to Plaintiffs' complaints of post-

5   assignment treatment derived from Corporate Defendants' refusal to provide Plaintiffs

6   with the same opportunities – discounts, incentives, group ads, packages, etc., which did

7   not appear to violate corporate policy – as the Union Agents.  Those complaints do allege,

8   and there is sufficient evidence to support an inference (as discussed above), that the

9   alleged predicate acts hampered Plaintiffs' business relations.  These lost opportunities

10  are more concrete: had the alleged predicate acts not occurred, i.e., had the things of value

11  not been solely funneled to the Union Agents, Plaintiffs (and other non-union employees)

12  would have allegedly also been able to take advantage of those opportunities.  Whether

13  those opportunities would have in fact prevented Plaintiffs' financial loss or led to

14  increased compensation (Dkt. #270, pp. 36-37), is a question for causation.  Further, "it is

15  important to distinguish between uncertainty in the fact of damage and in the amount of

16  damage."  Mendoza, 301 F.3d at 1171 (citing Knutson, 548 F.2d at 811 ("Different

17  standards govern proof of the fact and proof of the amount of damages.")).  The second

18  component – concrete loss – requires only that "[t]he plaintiff [ ] prove *some* damage, but

19  'proving the fact of damage . . . is satisfied by . . . proof of some damage flowing from the

20  unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not

21  the fact of damage.'"  Knutson, 548 F.2d at 811 (quoting Zenith Radio Corp. v. Hazeltine

22  Research Inc., 395 U.S. 100, 114 n. 9 (1969)).  And to the extent that Plaintiffs have

23  established a question of fact with respect to  lost opportunities in the form of improper

24  account assignments, workflow, and potentially available, post-assignment preferential

25  treatment, Plaintiffs have shown at least some damage flowing from RICO predicate acts.

26           Turning back to the first component, Plaintiffs must show that their injury was

27  proximately caused by the alleged preferential treatment (racketeering scheme).  Thus,

28

1    like <u>Mendoza</u>, the "key task" here is to determine whether this injury was "by reason of"

2    Defendants' alleged RICO violations.

3         "[A] plaintiff must [ ] show that the defendant's RICO violation proximately

4    caused her injury." <u>Canyon County v. Syngenta Seeds, Inc.</u>, 519 F.3d 969, 981 (9th Cir.

5    2008) (citation omitted).  "Proximate causation requires 'some direct relation between the

6    injury asserted and the injurious conduct alleged.'" <u>Id.</u> (quoting <u>Holmes v. Sec. Investor</u>

7    <u>Prot. Corp.</u>, 503 U.S. 258, 268 (1992)); <u>see</u> <u>Mendoza</u>, 301 F.3d at 1169-70 ("[P]otential

8    plaintiffs who have suffered 'passed-on' injury – that is, injury derived from a third

9    party's direct injury – lack statutory standing.").  Thus, to determine whether an injury is

10   "too remote" to establish proximate causation, courts look at three nonexhaustive factors:

> (1) whether there are more direct victims of the alleged wrongful conduct
> who can be counted on to vindicate the law as private attorneys general; (2)
> whether it will be difficult to ascertain the amount of the plaintiff's damages
> attributable to defendant's wrongful conduct; and (3) whether the courts
> will have to adopt complicated rules apportioning damages to obviate the
> risk of multiple recoveries.

<u>Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.</u>, 185

F.3d 957, 963 (9th Cir. 1999).  The evidence presented satisfied these factors at this time.

First, Plaintiffs and their non-union coworkers are the most direct victims of the

alleged scheme.  Plaintiffs do not complain of a passed-on harm; any such harm would be

only potentially be suffered by Plaintiffs' customers (who were not offered any post-

assignment discounts or incentives, etc.).  Plaintiffs' inability to obtain the things of value

given to the Union Agents (and thus lost opportunity to engage in business relations

absent such predicate acts) is not derived from some third party's direct injury.  <u>See, e.g.</u>,

<u>Mendoza</u>, 301 F.3d at 1170.  Plaintiffs have sufficiently shown that they are the most

direct victims of the alleged predicate acts.  (Dkt. #270, pp. 39-41).  Moreover, they are

the most immediate victims of the alleged RICO scheme "who can be counted on to bring

suit for the law's vindication."  <u>Id.</u>; <u>but see</u> <u>Canyon County</u>, 519 F.3d at 983 ("Given the

substantial-and fatal-shortcomings . . . in meeting Anza's proximate cause requirements,

1   we need not inquire into the question of whether there are more immediate victims of the

2   defendants' alleged RICO violations who are likely to sue.").

3          Second, the Court must turn to "the speculative measure of harm." <u>Mendoza</u>, 301

4   F.3d at 1170.  The speculative nature of injury depends on the amount of "alternative

5   causes that might be the actual source or sources of the [plaintiff's] alleged harm."

6   <u>Canyon County</u>, 519 F.3d at 983.  Despite Plaintiffs' contentions to the contrary, here,

7   like <u>Canyon County</u>, the causal chain is simply too attenuated to allow the fact-finder to

8   adequately ascertain the direct cause of Plaintiffs' harm from lost opportunities in the

9   form of post-assignment treatment.  Plaintiffs submit no evidence to reduce the extreme

10   speculation involved in that determination: the jury would be forced to evaluate the extent

11   to which Corporate Defendants' post-assignment preferential treatment let to Plaintiffs'

12   customers' decisions to cancel or reduce their advertising.  This would consist of

13   constructing the alternative scenario of what might have occurred had Corporate

14   Defendants allowed Plaintiffs to offer their customers discounts and incentives, and how

15   that would have affected those customers' decisions to continue purchasing advertising.

16   "This would mean an 'intricate, uncertain' inquiry of the type that the <u>Anza</u> Court warned

17   against."  <u>Id.</u> (quoting <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 460 (2006)).  But

18   this is not the case with respect to alleged account manipulation (improper assignment,

19   packaging), workflow, and post-assignment treatment that does not depend on the purely

20   speculative inference concerning a particular customer's reaction to perhaps being offered

21   some sort of discount or incentive to continue their account.  That includes predicate acts

22   such as the Courtesy Leasing and William Revis accounts, which do not appear to depend

23   on the sort of guess-work involved in determining what a particular customer may or may

24   not have done at a particular time (and in a particular situation).

25          Plaintiffs are correct to point out that there is a distinction between uncertainty in

26   the fact of damage and in the amount of damage, <u>see</u> <u>Knuston</u>, 548 F.2d at 811, and such

27   uncertainty at the motion to dismiss stage need not foreclose the plaintiff's attempt to

28   ascertain proximate cause and the amount of damage attributable to the alleged RICO

1   violation as opposed to intervening factors, see Mendoza, 301 F.3d at 1171.  However,

2   this is no longer the pleading stage; this is the later stage in the proceedings at which the

3   proximate cause issue is to be addressed.  See Mendoza, 301 F.3d at 1171 ("Questions

4   regarding the relevant labor market and the growers' power within that market are

5   exceedingly complex and best addressed by economic experts and other evidence at a

6   later stage in the proceedings.").  Although an inference may be drawn from the alleged

7   acts of preferential treatment and the fact that the Union Agents earned 139% more than

8   the average compensation of all other Phoenix premise representatives (PSOF ¶ 201), that

9   inference is unsupported to the extent that it relies on entirely speculative post-assignment

10  lost opportunities.  The asserted link between the preferential treatment afforded to the

11  Union Agents by Corporate Defendants in the form of post-assignment opportunities such

12  as discounts and incentives for customers is far too attenuated.  Plaintiffs' claims against

13  Defendants fail for lack of proximate causation to the extent they are based on those kinds

14  of alleged predicate acts.

15      Third, the Court must ask whether there is a significant risk of multiple recovery.

16  Importantly, "[t]his factor does not bar suit for 'different classes of plaintiffs, each of

17  which suffered a different concrete injury, proximately caused by the violation."

18  Mendoza, 301 F.3d at 1172.  Plaintiffs merely state that "there is no difficulty avoiding

19  multiple recovery here because this is not a suit for derivative or passed-on harm."  (Dkt.

20  #270, pp. 33-34).  As such, "Plaintiffs propose a range of damage estimates per Plaintiff,

21  with estimated damages flowing from a single lost opportunity example at one end and

22  the average earnings for the top Union agents who promoted the scheme at the other end."

23  (Dkt. #270, p.38).  Defendants, on the other hand, complain that "[Plaintiffs' damages

24  expert] goes on to assign to *each Plaintiff*, the full amount of the difference between what

25  Defendants earned and what the average sales representative earned."  (Dkt. #243, p.26)

26  (emphasis in original).

27      There is no dispute that "[t]he jury is allowed to act on probable and inferential

28  proof in determining the amount of damages even though such an award may be an

1   approximation." Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506,

2   1511 (9th Cir. 1985).  Despite Plaintiffs oddly analogizing the damages calculation to

3   being on an elevator in the Empire State Building (Dkt. #270, pp. 38-39), there is no risk

4   of multiple recovery as long as each Plaintiff seeks recovery for personal injury stemming

5   from specific predicate acts of preferential treatment.  For example, with respect to

6   account assignments, if a particular Plaintiff can prove that he or she should have

7   received a certain account, then he or she may potentially recover the estimated value of

8   that account.  If Plaintiffs cannot prove that who would have received a particular

9   account, then they may only recover approximately 1/40th of the estimated value of the

10  unlawfully diverted account (based on the percentage that any one employee might have

11  received the account).  Although more speculative, if in fact proven, damages derived

12  from workflow could presumably be approximated by determining what effect a re-

13  adjustment of the benchmark would have on a particular Plaintiff's sales performance

14  rating and resulting compensation.  In addition, to the extent that Plaintiffs have standing

15  to claim injuries related to post-preferential account assignments (see discussion above),

16  such as those derived from losses associated with write-offs, Plaintiffs may recover the

17  estimated value that such write-off or adjustment would have had on their compensation.

18  While some of these damages calculations may be more speculative than others, and may

19  result in more approximation, they are sufficiently based on each Plaintiffs' injury

20  derived from a particular violation.

21          However, Defendants are correct that Plaintiffs' damages calculations is

22  inappropriate to the extent that is based on "the assumption that every dollar of

23  compensation Wheeler and Ortega-Matson made in excess of the average, was based

24  upon preferential treatment."  (Dkt. #243, p.31).  Plaintiffs' speculation that the maximum

25  recovery based on the alleged preferential treatment is potentially "the total difference

26  between Plaintiffs' and Union agents' average compensation (approximately

27  $1,939,938.00 through 2006)" (Dkt. #270, p.38) is more than overly optimistic, bordering

28  on unreasonable.  Plaintiffs' damages calculation, varying in approximation depending on

1   the predicate act as it might, must be specific as to each Plaintiff and his or her specific

2   injury derived from a particular predicate.  As long as the damages calculation is

3   reworked to reflect only those acts to which a particular Plaintiff may claim injury (as

4   discussed above), it appears sufficient to avoid a significant risk of multiple recovery.

5                              3. Association-in-Fact Enterprise

6          To establish a violation of Section 1962(c), Plaintiffs must establish that

7   Defendants were associated with an enterprise engaged in interstate commerce and

8   "participate[d], directly or indirectly, in the conduct of such enterprise' s affairs."  18

9   U.S.C. § 1962(c).

10          An enterprise is defined as including "any individual, partnership, corporation,

11   association, or other legal entity, and any union or group of individuals associated in fact

12   although not a legal entity."  18 U.S.C. § 1961(4).  The second category comprises

13   "persons associated together for a common purpose of engaging in a course of conduct."

14   United States v. Turkette, 452 U.S. 576, 583 (1981).  "To establish the existence of such

15   an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal

16   or informal,' and 'evidence that the various associates function as a continuing unit.'"

17   Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir. 2007) (quoting Turkette, 452 U.S.

18   at 583).

19          Here, Plaintiffs allege that Defendants Dex (and previously Qwest), Ortega-

20   Matson, Wheeler, and the Union were an association-in-fact enterprise "in that they

21   formed an informal entity with the common goal of insuring labor peace through

22   improper means, including highly interdependent compensation relationships with an

23   informal, but effective mechanism using the existing corporate structure for controlling

24   and directing the affairs of the associations-in-fact on an ongoing basis."  (SAC ¶¶ 52-

25   54).  The Court notes that Defendants do not contest the existence of an association-in-

26   fact enterprise at this time.  (Dkt. #283, p.23).

27          In addition "to 'participate, directly or indirectly, in the conduct of such

28   enterprise's affairs, one must have some part in directing those affairs."  Reves v. Ernst &

1   _Young_, 507 U.S. 170, 179 (1993).  Moreover, "liability depends on showing that the

2   defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just

3   their *own* affairs.'"  Id. (emphasis in original).  As such, Defendants contend that "Dex

4   participated in the conduct of its *own* affairs, not . . . the *enterprise's* affairs." (Dkt. #283,

5   p.21) (emphasis in original).  However, the Court is skeptical of Defendants' contention

6   that its involvement in the alleged acts of preferential treatment in violation of Section

7   302 through "the treatment of losses and application of discounts on accounts, account

8   assignment," some of which are discussed above, does not constitute participating in the

9   conduct of the association-in-fact's affairs.  The defendant in Reves – an outside

10  accounting firm – was merely an instrument of the corporation's fraudulent scheme.  507

11  U.S. at 186.  Here, Dex is not merely a corporation that allegedly provided outside

12  professional services to an alleged unlawful enterprise.  Dex was directly involved in

13  providing the Union Agents with the alleged preferential treatment in violation of Section

14  302 of the LMRA, and thus clearly had some part in directing the enterprise's affairs.[13]

15

16
_____

17      [13]Defendants also contend that "Plaintiffs expressly admitted that Dex did not conduct

18  or participate in the conduct of the alleged association-in-fact enterprise" because Plaintiffs'
    counsel wrote in an April 8, 2008 email that "[b]ased on their review of the evidence

19  discovered to date, Plaintiffs conclude that . . . it was the Union Agents (with the assistance
    of the Union) . . . rather than the Corporate Defendants participating in the operations and

20  management of the Union and a related association-in-fact enterprise . . ." (Dkt. #283, p.24
    (Blanchard Decl., Ex. 35)).  Plaintiffs respond that Defendants "mischaracterize" the April

21  8, 2008 email, and that counsel simply meant that Plaintiffs believed the evidence showed
    that "it was the top two Union agents who were manipulating the Company to do their

22  bidding, not the other way around. . . . [but] the Company still gave the preferential
    treatment, making it an essential 'participant' in the conduct of the scheme." (Dkt. #270,

23  p.51 n. 5).  The Court will not interpret counsel's out-of-court statement as an admission that
    Dex did not participate in the conduct of the alleged association-in-fact.  Compare U.S. v.

24  One Heckler-Koch Rifle, 629 F.2d 1250, 1253 (1980) (treating representations in briefs to
    the Court as admissions) with Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 289

25  F.3d 589, 593 n. 4 (9th Cir. 2002) ("[T]he arguments and statements of counsel 'are not
    evidence and do not create issues of material fact capable of defeating an otherwise valid

26  motion for summary judgment.'") (quoting Smith v. Mack Trucks, 505 F.2d 1248, 1249 (9th
    Cir. 1974) (per curiam)).

27

28

1   Accordingly, Plaintiffs have sufficiently established a genuine issue of material fact

2   regarding Defendants' participation in the conduct of the alleged association-in-fact.

3         **C.    RICO CONSPIRACY (COUNT II), 18 U.S.C. § 1962(d)**

4         Title 18 U.S.C. § 1962(d) provides, in relevant part: "It shall be unlawful for any

5   person to conspire to violate any of the provisions of subsection ... (c) of this section."

6   "[S]ection 1962(d) makes it unlawful to conspire to conduct or participate in the conduct

7   of an enterprise's affairs, where its affairs are conducted through a pattern of racketeering

8   activity." Tille, 729 F.2d at 619.

9         It is the mere agreement to violate RICO that § 1962(d) forbids; it is not
          necessary to prove any substantive RICO violations ever occurred as a

10        result of the conspiracy.  The illegal agreement need not be express as long
          as its existence can be inferred from the words, actions, or interdependence

11        of activities and persons involved.

12  Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n, 298 F.3d 768, 774-75 (9th Cir.

13  2002) (citation omitted).  "It is only when proof of [an agreement the objective of which

14  is a substantive violation of RICO (such as conducting the affairs of an enterprise through

15  a pattern of racketeering)] is lacking that the evidence must establish the defendant's

16  participation or agreement to participate in two predicate offenses."[14] Tille, 729 F.2d at

17  619.

18        Here, Defendants argue that Plaintiffs' conspiracy claim against the Union fails

19  because "the Union has presented directed evidence that it had no role whatever in the

20  handling of the accounts that Plaintiffs have alleged to reflect favoritism, and that the

21  Union has not entered into or participated in any arrangement concerning the alleged

22  _____

23      [14]As such, Defendants' contention that "if the acts defendants conspired to commit do

24  not rise to the level of a RICO violation, there is no liability under RICO Section (d)" is
    wrong. (Dkt. #283, p.34).  See, e.g., Howard v. America Online Inc., 208 F.3d 741, 751 (9th

25  Cir. 2000) ("If a substantive violation is properly pleaded, a conspiracy claim may survive
    a factfinder's conclusion that there is not sufficient evidence to prove the violation.").

26  Regardless, as discussed above, Plaintiffs submit sufficient evidence to proceed on their
    substantive RICO claim.  That evidence supports an inference that Corporate Defendants and

27  Union Agents entered into an agreement to conduct the alleged enterprise's affairs through

28  a pattern of racketeering.

1  favoritism." (Dkt. #283, p.32). Defendants rely on the declaration of Peter Pusateri, the

2  Union's Business Manager and Financial Secretary, who disavows that the Union knew

3  of, or was involved in, any of the alleged acts of preferential treatment. (Dkt. #243, p.27;

4  Pusateri Decl., ¶ 7 (Dkt. #248)). Plaintiffs respond that the an agreement can be inferred

5  from the totality of the evidence presented, and that the Union is vicariously liable for the

6  acts of its agents. (Dkt. #270, p.270).

7       Plaintiffs present no evidence to support their contention that the Union itself

8  participated in any of the alleged predicate offenses. In addition, the evidence presented

9  does not support a reasonable inference that the Union entered into any sort of agreement

10 with either the Corporate Defendants or Union Agents. Importantly, "[a] [conspirator]

11 must [ ] have been 'aware of the essential nature and scope of the enterprise and intended

12 to participate in it.'" Howard, 208 F.3d at 751 (quoting Baumer v. Pachl, 8 F.3d 1341,

13 1346 (9th Cir. 1993)). However, the only evidence Plaintiffs specifically point to in their

14 "alternative plot interpretations" (Dkt. #270, p.9) to support their contention that the

15 Union engaged in the alleged conspiracy are written statements in the Moss & Barnett

16 Report that unnamed Union officials spoke at Company meetings and "potentially

17 conduct[ed] themselves in a manner which suggests that they [we]re providing direction

18 to management." (Dkt. #270, pp. 52-51). Not only are those statements likely

19 inadmissible, Plaintiffs submit no evidence to indicate who the union officials were, let

20 alone that the Union, as opposed to the Union Agents, provided direction to Corporate

21 Defendants. The existence of an illegal agreement involving the Union itself cannot be

22 inferred from the words, actions, or interdependence of activities and persons involved;

23 the most that can be inferred from the totality of the circumstances is the existence of an

24 agreement between the Union Agents and Corporate Defendants. See generally Oki

25 Semiconductor, 298 F.3d at 774-75. Thus, the Court must turn to the issue of vicarious

26 liability.

27      "[R]espondeat superior may be applied under RICO." Brady v. Dairy Fresh Prods.

28 Co., 974 F.2d 1149, 1153 (9th Cir. 1992); see Oki Semiconductor, 298 F.3d at 776 ("This

1    possibility of respondeat superior liability for an employee's RICO violations encourages

2    employers to monitor closely the activities of their employees to ensure that those

3    employees are not engaged in racketeering.") (citing <u>Brady</u>, 974 F.2d at 1155). "Under

4    RICO, however, respondeat superior liability attaches only if an employer benefitted from

5    its employee's RICO violation." <u>Oki Semiconductor</u>, 298 F.3d at 775 (citing <u>Brady</u>, 974

6    F.2d at 1154-55). If the employer benefitted, then "[the] employer will be vicariously

7    liable . . . if its employee's acts were committed within the course and scope of her

8    employment." <u>Id.</u> at 775-76 (citing Restatement (Second) Agency § 219 (1958)).

9    "Within the course and scope of employment means: (1) the conduct occurred

10   substantially within the time and space limits authorized by the employment; (2) the

11   employee was motivated, at least in part, by a purpose to serve the employer; and (3) the

12   act was of a kind that the employee was hired to perform." <u>Id.</u> at 776 (citing Restatement

13   (Second) Agency § 228)).

14        Here, although Plaintiffs speculate that the alleged preferential treatment

15   "aggrandized [the Union's] bargaining and grievance-processing power and influence

16   with the Company" (Dkt. #270, p.51), Plaintiffs no longer "allege that lax labor contract

17   provisions or negotiating concessions constituted any part of the racketeering scheme";

18   there are no allegations in the Second Amended Complaint that the Union agreed to lax

19   contract provisions or gave bargaining concessions. (Dkt. #270, p.28). In fact, Plaintiffs

20   now allege only that "the top two Union agents in the Phoenix office abused their position

21   of authority and power to manipulate [Corporate Defendants] into giving them

22   preferential treatment." (Id.). It is thus difficult to imagine how the Union, which is not

23   alleged to have given or obtained bargaining concessions, somehow benefitted from the

24   Union Agents "manipulation" of Corporate Defendants and receipt of things of value in

25   violation of Section 302 of the LMRA.[15]  Accordingly, based on the allegations and

26

27        [15]Corporate Defendants also argue that there is no evidence to show that "Dex

28   benefitted from its employee's alleged racketeering activity." (Dkt. #283, p.22). However,

1  evidence presented, the Court cannot hold that the Union somehow benefitted from the

2  Union Agents and Corporate Defendants alleged RICO conspiracy to conduct the affairs

3  of an enterprise through a pattern of racketeering (here, involving preferential treatment).

4      In addition, Plaintiffs allege that "[t]he Union knowingly and wilfully did not . . .

5  police the [ ] preferential treatment provided to Ms. Ortega-Matson and Mr. Wheeler."

6  (SAC ¶ 47).  But respondeat superior liability attaches to encourage employers to monitor

7  their employees' activities only to the extent that their employees act within the course

8  and scope of their employment.  See Oki Semiconductor, 298 F.3d at 777.  Here,

9  Plaintiffs allege that Ortega-Matson and Wheeler, who were authorized to represent union

10  members in the processing of union members' grievances with Corporate Defendants

11  (Dkt. #283, p.33), "use[d] their implied power to create or eliminate labor strife, to

12  influence their management contacts within Dex (and previously Qwest), and to ensure

13  that they receive[d] [ ] preferred treatment."  (SAC ¶ 48).  While that allegation, and any

14  inferences drawn from Plaintiffs' evidence, could potentially support that the Union

15  Agents' actions were of a kind that they were intended to perform on behalf of the Union,

16  Plaintiffs do not allege – and the evidence does not support – that Ortega-Matson and

17  Wheeler were in any way motivated by a purpose to serve the Union when they allegedly

18  "manipulated" Corporate Defendants into giving them preferential treatment.  Therefore,

19  the Union can not be held vicariously liable for Ortega-Matson and Wheeler's conduct.

20  **V.  PLAINTIFFS' MOTION FOR ADVERSE INFERENCE**

21      Plaintiffs move the Court for an adverse inference against Defendants under

22  Fed.R.Civ.P. 37(c).[16]  (Dkt. #272).  Specifically, Plaintiffs ask the Court to infer that

23

24

25  Corporate Defendants have not submitted sufficient evidence at this time to establish that
they were merely "victims" of their employees' alleged racketeering activity.  See Oki

26  Semiconductor Co., 298 F.3d at 775.

27      [16]Defendants contend that "Rule 37 sanctions are not appropriate unless Dex violated
a court order." (Dkt. #286, p.8).  However, in their Reply, Plaintiffs state that "[t]o the extent

28  Plaintiffs' reference to 'Rule 37(c)' in the caption of their Motion creates confusion,

1    certain additional documents would have supported Plaintiffs' preferential treatment

2    allegations had "[t]he Corporate Defendants [not] lost or destroyed the relevant documents

3    contrary to their own internal and statutory document retention requirements and in the

4    face of government and internal investigations into preferential account treatment for

5    Union agents."  (Dkt. #272, pp. 1-2).  In response, Corporate Defendants contend that an

6    adverse inference is unwarranted because (1) "Dex did not have a duty to preserve

7    documents relevant to this litigation until long after the document destruction," (2)

8    Plaintiffs are unable to prove that Dex destroyed the documents intentionally or in bad

9    faith, and (3) Plaintiffs cannot show that the destroyed documents would have been

10   relevant and material to their claims.  (Dkt. #286, p.1).[17]

11   / / /

12

13

14

15

16   Plaintiffs withdraw that reference and simply request an adverse inference under the Court's
     inherent authority to rule on evidentiary issues."  (Dkt. #288, p.3).  As such, the Court need
17   not address whether Rule 37 provides for sanctions absent the violation of a court order.  See
     Leon v. IDS Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006) ("There are two sources of
18   authority under which a district court can sanction a party who has despoiled evidence: the
     inherent power of federal courts to levy sanctions in response to abusive litigation practices,
19   and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to
     provide or permit discovery.'") (quoting Fjelstad v. Am. Honda Motor Co., 762 F.2d 1334,
20   1337-38 (9th Cir. 1985)).

21

22        [17]Defendants also argue that Plaintiffs have waived any claim for discovery sanctions
     when they "represented to the Court and the parties (several weeks before the close of
23   discovery) that only 10% of their informal document requests were outstanding and that all
     of their formal document request needs would be met once they received certain bonus and
24   earnings records and W-2s."  (Dkt. #286, p.15).  In response, Plaintiffs state that they
     "stopped asking for the 22 missing categories of market assignment and credit history
25   documents because the Corporate Defendants informed Plaintiffs by December 2007 that
     those documents no longer existed." (Dkt. #288, p.9).  Defendants do not necessarily dispute
26   this.  See DRSOF ¶ 207 ("Dex produced documents in *nearly* all categories for at least *a*
     *portion* of the relevant time period.").  As such, the Court will not hold that Plaintiffs waived
27   the ability to seek an adverse inference.

28

1   "'A federal trial court has the inherent discretionary power to make appropriate

2   evidentiary rulings in response to the destruction or spoliation[18] of relevant evidence.'"

3   Medical Laboratory Management Consultants v. American Broadcasting Companies,

4   Inc., 306 F.3d 806, 824 (9th Cir. 2002) (quoting Glover v. BIC Corp., 6 F.3d 1318, 1329

5   (9th Cir. 1993)).  A district court "has the broad discretionary power to permit a jury to

6   draw an adverse inference from the destruction or spoliation against the party or witness

7   responsible for that behavior."  Glover, 6 F.3d at 1329 (citing Akiona v. U.S., 938 F.2d

8   158, 161 (9th Cir. 1991)); see Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216

9   (S.D.N.Y. 2003) ("Zubulake IV") ("The spoliation of evidence germane 'to proof of an

10  issue at trial can support an inference that the evidence would have been unfavorable to

11  the party responsible for its destruction.'") (quoting Kronisch v. United States, 150 F.3d

12  112, 126 (2d Cir. 1998)).

13      "An employer's destruction of or inability to produce a document, standing alone,

14  does not warrant an inference that the document, if produced, would have contained

15  information adverse to the employer's case."  Park v. City of Chicago, 297 F.3d 606, 615

16  (7th Cir. 2002).  "'The duty to preserve material evidence arises not only during litigation

17  but also extends to that period before the litigation when a party reasonably should know

18  that the evidence may be relevant to anticipated litigation.'"  World Courier v. Barone,

19  2007 WL 1119196, at *1 (N.D. Cal. 2007) (quoting Kronisch v. United States, 150 F.3d

20  112, 126 (2d Cir. 1998)); see Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d

21  Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the

22  evidence is relevant to litigation or when a party should have known that the evidence

23  may be relevant to future litigation." ).  In addition, "Defendants engage in spoliation of

24  documents as a matter of law only if they had 'some notice that the documents were

25  potentially relevant' to the litigation before they was destroyed."  U.S. v. Kitsap

26

27      [18]Spoliation is "the destruction or significant alteration of evidence, or the failure to
    preserve property for another's use as evidence in pending or reasonably foreseeable
28  litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

1   Physicians Service, 314 F.3d 995, 1001 (9th Cir. 2002) (quoting Akiona v. United States,

2   938 F.2d 158, 161 (9th Cir. 1991)).  However, only a 'minimum link of relevance' is

3   required to permit a jury to draw an adverse inference.  Akiona, 938 F.2d at 161.

4         Moreover, despite Defendants' contention to the contrary, the party seeking to

5   introduce evidence of spoliation need not establish bad faith on the part of the party who

6   destroyed the evidence.  Glover, 6 F.3d at 1329 ("[A] finding of 'bad faith' is not a

7   prerequisite to [permit a jury to draw an adverse inference].") (citing Akiona, 938 F.2d at

8   368-70 & n. 2).   Nonetheless, "when relevant evidence is lost accidentally or for an

9   innocent reason, an adverse evidentiary inference from the loss may be rejected."

10  Medical Laboratory, 306 F.3d 806, 824 (9th Cir. 2002) (citing Blinzler v. Marriott Int'l,

11  Inc., 81 F.3d 1148, 1159 (1st Cir. 1996)).

12        Here, in early 2004, Frank Eichler, Corporate Defendants' General Counsel,

13  determined, after speaking with Plaintiff Marceau and other employees about "improper

14  practices," "irregularities," inflated revenue," and "people stealing accounts" (Dkt. #286,

15  p.4), "that there needed to be a complete audit to ensure that the company had no – or

16  what the issues were and make sure and sure [sic] that the company understood its risk, if

17  there was any, and then to manage that risk appropriately."  (DRSOF ¶ 62).  As a result,

18  Corporate Defendants hired the law firm of Moss & Barnett to conduct an internal audit

19  investigation into Corporate Defendants' account handling practices and procedures.

20  (PSOF ¶ 63).  Corporate Defendants announced the Moss & Barnett audit to Phoenix &

21  Mesa employees on April 21, 2004.  (PSOF ¶ 65).

22        Also, on or about April 21, 2004, Corporate Defendants "placed roughly 90 boxes

23  of account records, which had been kept in a storage room at the Dex facility, into . . .

24  approximately 15-20 large-sized bins on the loading dock."  (PSOF ¶¶ 77, 78; Dkt. #286,

25  p.4).  The documents included advertising orders and "advertising coordinator notifiers,

26  [or] ACNs, for years 2000 and 2003."  (DRSOF ¶ 77; Kruse Dep. at 28:21-29:2 (Dkt.

27  #276, Ex. 42)).  The documents were "picked up and recycled, or otherwise destroyed" on

28  April 22, 2004.  (Dkt. #286, p.4; PSOF ¶ 81).   Then, on April 29, 2004, seven days later,

1    Tim Bauer, Corporate Defendants' Corporate Compliance Officer, issued a legal hold "on

2    all existing files in the Phoenix and Mesa office due to the current audit."  (PSOF ¶ 84).

3            Plaintiffs contend that this evidence is sufficient to warrant an adverse inference:

4    Corporate Defendants knew or reasonably should have known that the documents were

5    relevant to anticipated litigation (Dkt. #288, pp. 4-5); "Defendants failed to produce 22

6    categories of market assignment and credit history documents from the relevant period"

7    (id., p.3); Plaintiffs' expert, "Brad Preber, specifically testified that the missing and

8    destroyed documents were directly relevant and necessary to his expert analysis of

9    Plaintiffs' account manipulation allegations" (id., p.9).  Defendants, on the other hand,

10   assert that destruction of the documents at the same time the audit was announced was

11   merely an unfortunate coincidence: the documents were not destroyed in anticipation of

12   litigation because the instant lawsuit was not filed until 2005, there were no pending

13   NLRB charges and "[i]f the audit was not prepared in anticipation of litigation [as

14   Magistrate Judge Duncan previously held in determining whether the Moss & Barnett

15   Report was covered by the work product doctrine], then it follows that the audit did not

16   trigger Dex's document preservation duties" (Dkt. #283, p.12); the documents were

17   destroyed because Defendants had to make room for additional office space (id., p.3);

18   moreover, the documents are not relevant because they "were copies of documents that

19   had already been sent to Dex's document retention facility, or were stored electronically"

20   and as "copies rather than originals, only documents that were less than a year and a half

21   old needed to be retained" (id., p.4).

22           In October 2007, Magistrate Judge Duncan determined that the Moss & Barnett

23   Report "was an audit designed to study and propose solutions for on-going management

24   issues facing the company."  (Dkt. #131, p.5).  And "in light of the history of the issues

25   addressed in the Report it is reasonable to believe that the Report would have been

26   prepared in the absence of anticipated litigation."  (Id.).  The Court will not revisit that

27   holding; however, its import is limited.  The fact that the Report was not eligible for work

28   product protection under Rule 26(b)(3) does not dictate a finding that documents that

were destroyed at the same time the audit begun were not destroyed in anticipation of

litigation.  See Hynix Semiconductor Inc. v. Rambus, Inc., 2006 WL 565893, at *24

(N.D. Cal. 2006) ("The fact that Rambus has previously claimed work product protection

for some documents dated prior to late 1999 does not dictate a finding that Rambus was

anticipating litigation at the time the documents were created.").  Frank Eichler,

Corporate Defendants' General Counsel, testified that Plaintiff Marceau's "allegations

and threats regarding improper revenue statements and those types of things" caused him

"some concern for the corporation."  (Eichler Dep. at 28:3-10 (Dkt. #274, Ex. 20)).  In

addition, although Eichler testified that the purpose of the Moss & Barnett Report was to

determine whether any of the allegations were accurate, which supports the determination

that the Report would have been prepared in the absence of anticipated litigation, Eichler

also testified that once the Report was complete, he would consider "what steps, if any,

[Corporate Defendants] need to take from a legal standpoint and from a business

standpoint."  (Id. at 38:18-39:1).  That testimony is sufficient to draw an inference that

although perhaps not the purpose of the Moss & Barnett Report, the prospect of litigation

was at the very least on Corporate Defendants' mind.  In addition, the fact that "no NLRB

charges were pending on the date on which Dex recycled the documents in question"

(Dkt. #286, p.11 n. 4), is not dispositive.  The issue is simply whether Defendants

reasonably should have anticipated future litigation; that NLRB charges had recently been

filed (Dkt. #286, pp. 10-11), along with Plaintiff Marceau's "allegations" and "threats,"

and Eichler's testimony, is sufficient to establish a reasonable inference that Corporate

Defendants were aware of the possibility of future litigation involving the instant claims.

      In addition, there is sufficient evidence to establish a genuine issue of fact as to

whether the destroyed documents were potentially relevant to Plaintiffs' claims.  Craig

Kruse, Corporate Defendants' Administrative Services Manager, testified that the

destroyed documents included advertising coordinator notifiers and advertising orders for

at least some of the relevant time period at issue in this litigation.  (Kruse Dep. at 28:21-

29:2 (Dkt. #276, Ex. 42); O'Hara Dep. at 14:20-23 ("[T]hey were operations records.")

1   (Minder Decl., Ex. 4) (Dkt. #287)).  In addition, Plaintiffs' expert, Bradley Preber, stated

2   that he believed that these sorts of documents were "critical to perform a complete and

3   comprehensive analysis."  (PSOF, Ex. 38 ¶¶ 19-29).  Thus, based on the totality of the

4   circumstances, it is reasonable to infer that documents pertaining to sales accounts are at

5   the very least potentially relevant to this litigation, which involves, among other things,

6   allegations of account manipulation.  See Medical Laboratory, 306 F.3d at 824 (a district

7   court may base its conclusion regarding whether to issue an adverse inference instruction

8   on the totality of the circumstances).

9        Nonetheless, Defendants argue that an adverse inference should be rejected

10  because these documents were destroyed for an innocent reason – they were only copies,

11  not original document, and thus were recycled pursuant to Corporate Defendants'

12  retention policy of only retaining copies of documents that were less than a year and a

13  half old.  (Dkt. #286, p.4).  In support, Defendants point to Kruse's testimony that the

14  documents were "only copies of records"; "[t]hese were copies of sales records.  The

15  sales employees are responsible for maintaining their own files of what was reported to us

16  for input."  (Kruse Dep. at 38:3-25 (Minder Decl., Ex. 3)).  However, it is unclear from

17  Kruse's deposition testimony whether Kruse, an administrative services manager, had

18  personal knowledge that the documents were copies of original sales records.  In addition,

19  although Kruse stated that because the destroyed documents were copies, they did not

20  need to be "imaged" or recorded into "Vista," Corporate Defendants' storage and account

21  tracking system, Kruse acknowledged that neither the sales representatives nor Vista had

22  records of directory closing reports and proof pages of directories from 2000 to 2002.

23  (Id. at 51:23-52:23).  Moreover, Brenda Preuss, who worked in the Market Assignments

24  department, stated that documents placed in the bins "were in bright orange jackets (large

25  envelopes)," and that "sales contracts and Account Coordinator notes were kept in bright

26  orange jackets"; "these types of documents also consist of customer claims."  (Pruess

27  Affidavit, ¶¶ 47-55 (Dkt. #263); Condit Dep. at 182:19-183:1 (Preuss "show[ed] concern

28  that [the documents put out for recycling] were important documents.") (PSOF, Ex. 23)).

1   That evidence, in addition to the totality of the circumstances, establishes questions of

2   fact concerning the nature of the destroyed documents, in addition to credibility

3   determinations, that are inappropriate for resolution on summary judgment.  Accordingly,

4   the Court cannot draw an adverse inference at this time and must deny without prejudice

5   Plaintiffs' Motion to the refiling of the Motion prior to trial as a Request for an Adverse

6   Jury Instruction.

7   **VI.   SUMMARY**

8          Plaintiff Smith's civil RICO claims are barred by the statute of limitations.

9   Plaintiffs Marceau, Bodine, McKinney, and Pine may proceed with their civil RICO

10  claims.

11         In addition, Plaintiffs have submitted sufficient evidence to establish a genuine

12  issue of material fact that the Petersen Johnson account, the Starving Students and A-1

13  Professional Movers accounts, the Sunwest Dental account, the Courtesy Leasing

14  account, the William Revis account, and the acts with respect to workflow SPE points

15  may constitute RICO predicate acts.  However, there is insufficient evidence to establish

16  that the New West Lending account and the Tots Unlimited and Sunrise Preschools

17  accounts constitute violations of Section 302 of the LMRA, and thus those accounts

18  cannot be considered predicate acts for purposes of Plaintiffs' civil RICO claims.

19  Further, due to lack of proximate causation, Plaintiffs may not seek damages resulting

20  from predicate acts that did not hamper Plaintiffs' business relations or damages from

21  post-assignment opportunities such as discounts and incentive.  Nonetheless, the Court

22  finds that the remaining Plaintiffs do possess statutory standing to seek damages resulting

23  from lost assignment opportunities and certain post-assignment opportunities, including

24  account adjustments (if proven at trial).  Moreover, Plaintiffs' damages calculation, when

25  adjusted to reflect only those cognizable and specific injuries suffered by a particular

26  Plaintiff due to a particular predicate act, is not too speculative or "intricate" and

27  "uncertain" an inquiry to allow Plaintiffs' claims to proceed to trial.  Finally, there is

28  insufficient evidence to find that Defendant International Brotherhood of Electrical

1    Workers Local 1269 conspired to violate RICO section 1962(c) in violation of 18 U.S.C.

2    § 1962(d).

3        **Accordingly,**

4        **IT IS HEREBY ORDERED** denying Plaintiffs' Motion for Adverse Inference.

5    (Dkt. #272).

6        **IT IS FURTHER ORDERED** granting in part and denying in part Defendants

7    Dex Media, Inc. and Qwest Communications International, Inc.'s Motion for Summary

8    Judgment.  (Dkt. #256).

9        **IT IS FURTHER ORDERED** granting in part and denying in part Defendants

10   Ortega-Matson, Wheeler, and International Brotherhood of Electrical Workers Local

11   1269's Motion for Summary Judgment.  (Dkt. #257).

12       **IT IS FURTHER ORDERED** setting this matter for Status Hearing on April 27,

13   2009 at 4:30 p.m. before Judge Mary H. Murguia, at which time a Trial date will be set.

14       DATED this 31st day of March, 2009.

15

16

17   _____
     Mary H. Murguia
18   United States District Judge

19

20

21

22

23

24

25

26

27

28